# WELLINGTON SYSTEMS, INC., ET AL. *v.* REDDING GROUP, INC., ET AL.
## (AC 16334)

O'Connell, C. J., and Lavery and Spear, Js.

Argued November 6, 1997—officially released June 23, 1998

*Christopher T. Coburn*, with whom, on the brief, were *Robert S. Bello*, *Lawrence M. Lapine* and *Thomas M. Cassone*, for the appellants-appellees (plaintiffs).

*David S. Maclay*, for the appellees-appellants (defendants).

LAVERY, J. This appeal involves the dissolution of a partnership. The plaintiffs[1] appeal from the judgment rendered, after a trial to the court, awarding the defendants[2] $72,213. The plaintiffs claim that the trial court improperly (1) granted summary judgment, (2) found that the named plaintiff, Wellington Systems, Inc. (WSI), was not entitled to share in either the postdissolution revenues of contracts negotiated prior to dissolution or the revenues from contracts in existence at the date of dissolution until the expiration of those contracts, and (3) allocated partnership expenses. The defendants filed a cross appeal, claiming that the trial court was incorrect in failing to find that (1) the plaintiffs breached their fiduciary duty to the defendants, (2) the plaintiffs' conduct caused the demise of the named defendant Redding Group, Inc. (RGI), and resulted in $1.5 million in damages to the defendants, (3) the plaintiffs Fred Stahl and Gene Goodman were also jointly and severally liable for the judgment and (4) prejudgment interest was also due.

The record discloses the following facts and procedural history. The defendant corporation, RGI, developed and marketed computer software. The individual defendants, Lydia Fazio and John Theys, were the principal stockholders of RGI. The plaintiff corporation, WSI, was a computer consulting firm owned by the individual plaintiffs, Stahl and Goodman. In 1981, RGI decided to market one of its software products to the business market. This product, GrafTalk, allowed users to design charts and graphs. The defendants contacted Stahl for assistance in negotiations with a potential customer. Thereafter, Stahl introduced the defendants

---

[1] The plaintiffs are Wellington Systems, Inc., and its two principal shareholders and officers, Fred Stahl and Gene Goodman.

[2] The defendants are Redding Group, Inc. (RGI), and its two principal shareholders and officers, John Theys and Lydia Fazio.

to Goodman, his coowner in WSI. In a letter from the defendants to the plaintiffs dated November 11, 1981, the parties agreed on the percentage due the plaintiffs based on gross receipts from sales generated by the plaintiffs. At some point in 1982, RGI and WSI agreed that WSI would act as a sales representative and marketing consultant to assist RGI in selling its products in return for a share of the receipts. The two corporations, RGI and WSI, formed a partnership known as Redding Group Services (RGS).

On March 26, 1984, WSI, the individual plaintiffs, RGI, and the individual defendants signed a letter of intent to merge RGS into RGI and to make the individual plaintiffs shareholders and officers of RGI. No such formal agreement was ever signed. Several months after the letter of intent was signed, the parties had a falling out, and the defendants terminated their business relationship with the plaintiffs and dissolved the RGS partnership.

The plaintiffs commenced this suit in 1984, and their amended complaint of March 13, 1985, contained six counts. The first count was against RGI, alleging that it had breached an agreement to restructure the RGS partnership agreement into one corporation, and to give Stahl and Goodman ownership interests in RGI. The second count was against RGI, Theys and Fazio, alleging that the defendants had made certain representations that Stahl and Goodman would become shareholders in RGI, and that the defendants knew such representations to be false. The third count was against RGI, alleging that RGI had interfered with the plaintiffs' customers and caused monetary damages to the plaintiffs. In the fourth count, the plaintiffs alleged that Theys and Fazio had interfered with the plaintiffs' contractual rights with RGI. In the fifth count, the plaintiffs alleged that RGI, Theys and Fazio had engaged in a conversion of funds belonging to the plaintiffs. In the sixth count,

the plaintiffs sought an accounting and the appointment of a receiver for the RGS partnership.

The defendants filed an answer generally denying the material allegations of the complaint, and a revised special defense, setoff and counterclaim. In their special defense and counterclaim, the defendants alleged that the plaintiffs had breached their partnership agreement, their fiduciary duties to the defendants, the implied covenant of good faith and fair dealing, and had engaged in a conversion and a "secret plan" to deprive Theys and Fazio of their ownership of RGI. The defendants further claimed that as a result of the plaintiffs' activities, RGI was forced out of business, and the defendants were deprived of their investment in RGI and incurred legal fees in connection with said activities.

In 1989, the defendants moved for summary judgment as to the first five counts of the six count complaint. Summary judgment was granted as to the first five counts. The court based its decision to grant summary judgment on the handwritten "letter of intent" dated March 26, 1984, summarizing the future merger of RGS into RGI, which, by its own terms, stated that it was contingent on the execution of a formal agreement.[3] Because the court found that no formal agreement had ever been entered into, it concluded that the first five counts of the complaint could not survive the defendants' motion for summary judgment.

The only causes of action that were tried were the sixth count of the amended complaint seeking an accounting of the dissolution of the partnership RGS, and the defendants' counterclaim. The trial was held between October, 1992, and March, 1993. The initial

---

[3] The "letter of intent" stated: "This letter of intent is only a moral commitment and is contingent upon and subject to a formal agreement which is mutually satisfactory." The letter was signed by all of the parties to this action.

memorandum of decision, dated June 21, 1995, included the court's decision on the accounting, found for the plaintiffs on the defendants' counterclaim and ordered that the $46,000 remaining balance of RGS, held in escrow, be released to the defendants. Subsequent supplemental memoranda of decision were issued on January 2 and August 23, 1996, culminating in the August 23, 1996 judgment, in favor of RGI against its former partner WSI in the amount of $72,213.

I

The plaintiffs' first claim on appeal is that the trial court improperly granted the defendants' motion for summary judgment as to the first five counts of the plaintiffs' amended complaint. Because each count raises a separate legal claim, we will discuss each individually. We first set forth our standard of review when faced with a challenge to a trial court's decision to grant a motion for summary judgment.

"The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book § 384 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 744–45, 660 A.2d 810 (1995). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Id., 745. The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law; *D.H.R. Construction Co.* v. *Donnelly*, 180 Conn. 430, 434, 429 A.2d 908 (1980);

and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Practice Book § 381. . . . *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 105, 639 A.2d 507 (1994)." (Internal quotation marks omitted.) *Doty* v. *Mucci*, 238 Conn. 800, 805–806, 679 A.2d 945 (1996); *Thompson & Peck, Inc.* v. *Division Drywall, Inc.*, 241 Conn. 370, 374–75, 696 A.2d 326 (1997).

"Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citations omitted; internal quotation marks omitted.) *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 255, 654 A.2d 748 (1995).

A

The plaintiffs argue that the court improperly granted summary judgment as to the first count[4] of the complaint because (1) the court relied exclusively on the conditional language of the letter of intent and failed

---

[4] The first count of the plaintiffs' complaint, as against the defendant RGI, provided:

"1. At all times mentioned herein, the plaintiff, Wellington Systems, Inc., hereinafter referred to as WSI, was and is a Connecticut corporation located at 2730 High Ridge Road and doing business as a computer consulting firm.

"2. At all times mentioned herein, the plaintiffs, Fred Stahl and Gene Goodman, hereinafter referred to as Stahl and Goodman, respectively, were and are officers and the sole shareholders in WSI.

"3. At all times mentioned herein, the defendant, Redding Group, Inc., hereinafter referred to as RGI, was and is a Connecticut corporation located

to take into consideration whether subsequent conduct by the defendants served to make the agreement binding, (2) the letter of intent was not a condition precedent, (3) an issue of material fact exists as to whether such condition precedent was waived or excused and (4) an issue of material fact exists as to whether the

in Ridgefield, Connecticut, and doing business as a computer software producer.

"4. At all times mentioned herein, Lydia Fazio and John Theys, hereinafter referred to as Fazio and Theys, respectively, were acting as agents, servants, officers and employees of RGI within their authority to do so.

"5. In 1981, WSI and RGI entered into various business relationships whereby WSI would represent and negotiate for the sale and licensing of RGI's products. In or around April of 1982, WSI and RGI entered into a more formal relationship as partners, said partnership is and was known as Redding Group Services, hereinafter referred to as RGS. Said partnership arrangement provided for WSI to market and service certain software products produced by RGI in return for a sharing of the receipts from the licensing, sale and/or servicing of such products, and from other products subsequently acquired by the partnership.

"6. Between April of 1982 and October of 1983, WSI did in fact render services for RGS.

"7. In the fall of 1983, WSI and RGI agreed to restructure the partnership arrangement into one corporation.

"8. RGI, in consideration of moneys owing WSI and Stahl and Goodman from revenues of RGS and, in order to continue with the business relationship, agreed that Stahl and Goodman would become officers and 37% shareholders in RGI.

"9. In reliance on said promise, WSI and Stahl and Goodman forgave sums owing from RGS and agreed that the assets and funds in RGS would become part of and incorporated in RGI.

"10. Fazio and Theys represented between the fall of 1983 and spring of 1984 that the agreement was being finalized, and the appropriate papers were drawn and submitted to Stahl and Goodman who executed same.

"11. Between the fall of 1983 and June of 1984, Stahl and Goodman acted as officers in RGI, and RGI held Stahl and Goodman out to be shareholders and officers.

"12. Between the fall of 1983 and June of 1984, RGS continued to exist and function as a part of and synonymous with RGI.

"13. Despite RGI's promises, in May of 1983, RGI advised Stahl and Goodman that it did not intend to abide by its agreement and understanding, refused to execute the agreements, although Stahl and Goodman had done so, terminated all future financial dealings, diverted funds from RGS to RGI, refused to pay funds owing Stahl and Goodman and WSI, refused to issue

circumstances surrounding the transaction and the defendants' actions, subsequent to the letter of intent, estop them to deny that the contractual relationship exists.

In support of its motion for summary judgment, the defendants submitted an affidavit signed by Theys, along with four exhibits. The exhibits were a letter of November 11, 1981, addressed to Stahl and signed by Fazio as vice president of RGI, confirming an oral agreement between WSI and RGI regarding payment for WSI's future services; a letter dated October 11, 1982, signed by both Fazio and Stahl, concerning the handling of RGI products by RGS; the March 26, 1984 letter of intent; and a memorandum from Goodman to Jorge Dorfsman. In opposition to the motion for summary judgment, the plaintiffs submitted an affidavit signed by Goodman. There were no accompanying exhibits or other evidence.

In finding that there were no disputed issues as to any material facts, the trial court relied on the fact that there was no formal written agreement following the letter of intent. The court noted that the plaintiffs' affidavit did not claim that any such agreement ever existed. To reach its decision that no formal agreement

---

Stahl and Goodman the shares of stock rightfully due them, approached employees of WSI and RGS with the intent of hiring same, wrongfully appropriated inventory and equipment, and diverted and directed contractual rights and benefits from RGS to RGI.

"14. As a result of the defendant's breach of the agreement, the plaintiffs have been irreparably damaged, and they have no adequate remedy at law.

"WHEREFORE, the plaintiffs pray for:

"1. Specific performance of the agreements.

"2. Issuance of the stock rightfully due the plaintiffs.

"3. A temporary and permanent injunction enjoining RGI from contacting and diverting funds, accounts payable and contractual rights to RGS.

"4. Damages.

"5. The appointment of a receiver.

"6. Other relief as equity doth pertain."

existed, the court relied on a three part test utilized by this court in *Fowler* v. *Weiss*, 15 Conn. App. 690, 694, 546 A.2d 321, cert. denied, 209 Conn. 814, 550 A.2d 1082 (1988). "Whether the parties intended legally to bind themselves prior to the execution of a formal contract is to be determined from (1) the language used, (2) the circumstances surrounding the transaction, and (3) the purpose that they sought to accomplish. *Klein* v. *Chatfield*, 166 Conn. 76, 80, 347 A.2d 58 (1974)." *Fowler* v. *Weiss*, supra, 693. The court concluded that a formal written agreement was a condition precedent to a formal contract between the parties and, because one had not been executed, either party could have properly withdrawn from negotiations.[5]

We agree with the trial court that under the *Fowler* test the parties did not intend to bind themselves prior to the execution of a formal contract. We also agree with the plaintiffs, however, that an issue of material

---

[5] The trial court stated: "The recent Appellate Court decision of *Fowler* v. *Weiss*, [supra, 15 Conn. App. 694], quotes *Atlantic Terra Cotta Co.* v. *Chesapeake Terra Cotta Co.*, 96 Conn. 88, 101, 113 A. 156 (1921), as follows: 'It was essential to the creation of a contract that a formal written agreement should be executed. This formal written agreement was a condition precedent to the completion of a contract, and until such formal written agreement was executed the parties were still in the stage of negotiations for a contract and either party could withdraw from the negotiations.'

"The *Fowler* case involved a real estate binder and indicates that a threefold test is required to determine whether a formal contract has been negotiated: '(1) the language used, (2) the circumstances surrounding the transaction, and (3) the purpose that they sought to accomplish.' Id., 693. In the present case the 'language' of the letter of intent by its own terms is 'contingent' upon a formal agreement being executed. Similar to the binder in *Fowler*, the 'circumstances' indicate that although an important document, the letter of intent was not prepared by an attorney. The 'purpose' was clearly that the parties intended that various details would have to be negotiated before a final binding agreement was executed.

"These cases make it clear, I believe, that although the parties intended at one point to make the individual defendants a part of RGI, no such formal agreement was ever consummated, and hence the five counts of plaintiffs' complaint, which are based on an alleged agreement which never came into existence, cannot survive the defendants' motion for summary judgment."

fact exists as to whether the defendants are estopped to deny that a contractual relationship exists.

"Under the law of contract, a promise is generally not enforceable unless it is supported by consideration. E. Farnsworth, Contracts (1982) § 2.9, p. 89; A. Corbin, Contracts (1963) § 193, p. 188. This court has recognized, however, the 'development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor; see Restatement (Second), Contracts § 90 (1973).' *Sheets* v. *Teddy's Frosted Foods, Inc.*, [179 Conn. 471, 475, 427 A.2d 385 (1980)]; *Hebrew University Assn.* v. *Nye*, 148 Conn. 223, 232, 169 A.2d 641 (1961); see A. Corbin, supra, § 194, p. 193. Section 90 of the Restatement Second states that under the doctrine of promissory estoppel '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all. E. Farnsworth, supra, § 2.19, p. 95." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987). "Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . . It is fundamental that a person who

claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge. . . . *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 366, 659 A.2d 172 (1995); see also *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, [supra, 213]." (Internal quotation marks omitted.) *Chotkowski* v. *State*, 240 Conn. 246, 268, 690 A.2d 368 (1997).

A review of the first count of the complaint indicates that the plaintiffs alleged both of those elements. As to the first element, the complaint alleges that the defendants (1) agreed to restructure the partnership arrangement into one corporation, (2) agreed that Stahl and Goodman would become officers and 37 percent shareholders in RGI in order to continue with the business relationship and in consideration of moneys owed to the plaintiffs, (3) represented that the agreement was being finalized and (4) held Stahl and Goodman out to be shareholders and officers of RGI. Regarding the second element, the plaintiffs allege that they forgave money owed to them and agreed that the assets and funds in RGS would become part of and incorporated in RGI, and continued with the business relationship in reliance on the defendants' actions. In Goodman's affidavit, he again states that in consideration for money owed to him, to WSI and to Stahl, and to continue with the business relationship, RGI agreed to make Stahl and Goodman officers and stockholders in RGI. Thus, the plaintiffs have stated that they changed their position in reliance on the promises made to them by the defendants. Further, by forgiving money owed to them and by continuing the business relationship they suffered injury.

Although Theys' affidavit stated that the plaintiffs never forgave the money they claimed was owed to them, and that neither the books nor records of RGS

or RGI indicate the forgiving of any debts, that does not suffice to show that a genuine issue of fact is not in dispute. The trial court should not have granted the motion for summary judgment on count one of the plaintiffs' complaint as to the issue of estoppel only. *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 846, 708 A.2d 1361 (1998).

B

The plaintiffs next claim that the court improperly granted summary judgment as to the second count[6] of the complaint because after concluding that no formal agreement existed, the court failed to consider the claim of fraudulent misrepresentation, which is independent of any agreement and is a tort not dependent on an agreement.

"The elements of fraudulent misrepresentation are as follows: (1) a false representation must be made as

[6] The second count of the complaint, as against the defendants RGI, Fazio and Theys, repeats paragraphs one through seven of the first count and further alleges the following:

"8. The defendants, Fazio and Theys, represented that if WSI, Stahl and Goodman relinquished their rights to funds, contracts and licenses in RGS and, in effect, merge RGS and RGI, Stahl and Goodman would become shareholders, officers and employees of and in RGI.

"9. The plaintiffs, in reliance on the representation of the defendants, turned over all partnership assets to the corporation and relinquished rights to revenues in the partnership, and rendered services as officers and employees of RGI.

"10. The representations of the defendants were false and the defendants knew them to be false when they were made by the defendants to induce the plaintiffs to convey their interests in the partnership to the defendants, the defendants knowing at the time of its representation that it did not intend to abide by the agreement to issue stock to Stahl and Goodman.

"11. As a result of the defendants' fraudulent misrepresentation the plaintiffs have been damaged.

"WHEREFORE, the plaintiffs pray [for]:

"1. Damages.

"2. Punitive damages."

to a statement of fact; (2) the statement was untrue and known by the defendant to be untrue; (3) the statement was made to induce the plaintiff to act; and (4) the plaintiff acted on the false representation to [its] detriment. *Kavarco* v. *T.J.E., Inc.*, 2 Conn. App. 294, 295–96, 478 A.2d 257 (1984)." *Dorsey* v. *Mancuso*, 23 Conn. App. 629, 633, 583 A.2d 646 (1990), cert. denied, 217 Conn. 809, 585 A.2d 1234 (1991).

The plaintiffs properly alleged all four elements of a fraudulent misrepresentation claim in the second count. See footnote 6. Although the defendants' affidavit does state that the plaintiffs never forgave any money they claimed was owed to them, the evidence produced is not enough to show the absence of any genuine issues of material fact as to the claim of fraudulent misrepresentation. The trial court should not have granted the defendants' motion for summary judgment as to the second count of the plaintiffs' complaint.

## C

The plaintiffs next claim that the court improperly granted summary judgment as to the third count of the complaint because it failed to consider the plaintiffs' allegations that RGI improperly diverted contractual rights and funds of RGS, in which WSI had a right and interest.[7]

---

[7] The third count of the complaint, as against RGI, repeats paragraphs one through nine of the first count and further alleges:

"10. RGI has contacted customers of RGS and has diverted contractual rights and funds of RGS, in which WSI has a right and interest, to RGI; as a result WSI has, and will, suffer damages.

"11. WSI is, and has been, irreparably damaged by RGI's actions and has no adequate remedy at law.

"WHEREFORE, the plaintiffs pray [for]:

"1. A temporary and permanent injunction enjoining RGI from diverting funds to itself and interfering with RGS' contractual rights.

"2. Damages.

"3. An accounting.

"4. Other relief as equity doth pertain."

The plaintiffs specifically allege that after the defendants dissolved RGS, RGI received money from contracts in existence at the time of dissolution and from contracts negotiated prior to the dissolution for which the plaintiffs were entitled to a percentage. The defendants failed to offer any evidence to refute that allegation. Therefore, a genuine issue of material facts exists, and the court improperly granted summary judgment as to this count. The trial court should not have granted the defendants' motion for summary judgment as to the third count of the complaint.

## D

The plaintiffs next claim that the court improperly granted summary judgment on the fourth count of the complaint because a claim for tortious interference with contractual relations is independent of the existence of any contractual agreement.[8]

"This court has long recognized a cause of action for tortious interference with contract rights or other business relations. . . . While our cases have not focused with particularity on what acts of interference are tortious, we have made it clear that not every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud,

---

[8] The fourth count of the complaint, against Fazio and Theys, repeats paragraphs one through eleven of the first count and further alleges:

"12. The defendants, Fazio and Theys, knowingly, tortiously and maliciously interfered with the contractual rights of Stahl and Goodman with RGI so that RGI repudiated its agreement as aforesaid.

"13. In addition, the defendants, Fazio and Theys, interfered with WSI's right to share in contracts generated, created or initiated by contacting customers of RGS and diverted monies and contractual rights to RGI.

"WHEREFORE, the plaintiffs pray [for]:

"1. Damages.

"2. Punitive damages."

misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . *Kecko Piping Co.* v. *Monroe,* [172 Conn. 197, 201–202, 374 A.2d 179 (1977)]. . . . *Blake* v. *Levy,* 191 Conn. 257, 260–61, 464 A.2d 52 (1983). In *Blake,* we also determined that [i]n an action for intentional interference with business relations . . . the better reasoned approach requires the plaintiff to plead and prove at least some improper motive or improper means." (Citation omitted; internal quotation marks omitted.) *Kakadelis* v. *DeFabritis,* 191 Conn. 276, 279, 464 A.2d 57 (1983).

The plaintiffs allege that Fazio and Theys knowingly, tortiously and maliciously interfered with the contractual rights of Stahl and Goodman with RGI, the result of which was RGI's repudiating its agreement to make Stahl and Goodman officers and shareholders in RGI. Because the court found that this agreement had not become final, it granted summary judgment as to this count.

On appeal, the plaintiffs argue that even if the agreement is unenforceable as a contract, their claim of tortious interference with contractual relations is valid. " 'The agreement need not, however, be enforceable by the plaintiff as a contract . . . . The law of course does not object to the voluntary performance of agreements merely because it will not enforce them, and it indulges in the assumption that even unenforceable promises will be carried out if no third person interferes.' [W.] Prosser, Torts (4th Ed.) § 129, p. 932. Accordingly, the law not only does not restrict its protection to rights resting on enforceable contractual relationships, 'but it also forbids unjustifiable interference with any man's right to pursue his lawful business or occupation and to secure to himself the earnings of his industry.' *Skene* v. *Carayanis,* 103 Conn. 708, 714, 131 A. 497 [1926]. Thus, it is not essential to the cause of action that the tort has resulted in an actual breach of

contract. *Goldman* v. *Feinberg*, 130 Conn. 671, 674, 37 A.2d 355 [1944]." *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.*, 169 Conn. 407, 414–15, 363 A.2d 86 (1975).

Although the plaintiffs' claim appears to be persuasive, we agree with the defendants' argument that because the plaintiffs alleged that the defendants Fazio and Theys were at all times acting as agents of RGI, they cannot have interfered with the contractual relations of the plaintiffs and RGI. "It has long been considered tortious either to induce a breach of contract or to interfere with financial expectancies. Unfortunately, courts have tended to confuse these two types of actions, and there is no clear enumeration of their requisite elements. However, it is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two *other* parties. *Hiers* v. *Cohen*, [31 Conn. Sup. 305, 310, 329 A.2d 609 (1973)]; *R an W Hat Shop, Inc.* v. *Sculley*, 98 Conn. 1, 14, 118 A. 55 (1922)." (Emphasis in original.) *Paint Products Co.* v. *Minwax Co.*, 448 F. Sup. 656, 658 (D. Conn. 1978). "[A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract, *Boyce* v. *American Liberty Insurance Co.*, 204 F. Supp. 317, 318 (D. Conn. 1962); see also *Kecko Piping Co.* v. *Monroe*, [supra, 172 Conn. 202]; *Shaw* v. *Merrick*, [60 App. Div. 2d 830, 830, 401 N.Y.S.2d 508 (1978)], [but the agent] could be held liable for such interference or inducement if he did not act legitimately within his scope of duty but used the corporate power improperly for personal gain." *Bowman* v. *Grolsche Bierbrouwerij B.V.*, 474 F. Sup. 725, 733 (D. Conn. 1979).

Because the plaintiffs failed to allege or to offer any evidence that Fazio and Theys were not acting legitimately within the scope of their authority, summary judgment was properly granted as to this count. No genuine issue of material fact is in dispute concerning the legitimacy of the authority of Fazio and Theys to act on behalf of RGI. Therefore, to hold either liable would be to hold RGI liable in tort for interfering with its own contract, and that is not possible. We affirm the trial court's granting of summary judgment as to the fourth count of the complaint.

### E

The plaintiffs' final claim as to the granting of summary judgment is that the trial court improperly granted summary judgment on the fifth count of the complaint, which alleged conversion.[9] Specifically, the plaintiffs allege in the fifth count that the defendants wrongfully appropriated moneys, equipment, contractual rights and inventory.

"Conversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights." *Polivy* v. *Air One, Inc.*, 46 Conn. App. 573, 577, 700 A.2d 71, cert. denied, 243 Conn. 937, 702 A.2d 644 (1997).

The defendants failed to address the plaintiffs' conversion claims in their motion for summary judgment and offered no evidence proving that no genuine issue of material fact exists. The defendants appear to argue

---

[9] The fifth count of the complaint, against all defendants, repeats paragraphs one through thirteen of the first count, paragraph eight of the second count, paragraph ten of the third count, paragraph thirteen of the fourth count and further alleges the following:

"17. The defendants have wrongfully converted to their own use moneys, contractual rights, inventory and equipment of the plaintiffs.

"WHEREFORE, the plaintiffs pray [for]:

"1. Damages."

that when they notified the plaintiffs that the negotiations were terminated, and that the rights of the plaintiffs and RGS to sell RGI products were terminated, any obligation to share in rewards that might exist from their past business dealings was also terminated. They also appear to rely on their claim that the plaintiffs "walked out of RGS with $57,000 more than they were entitled to." Because the defendants failed to sustain their burden of showing that there was no genuine issue of material fact concerning the conversion claim, the trial court should not have granted their motion for summary judgment as to the fifth count of the complaint.

II

The plaintiffs next claim that the trial court improperly found that WSI was not entitled to share in either the postdissolution revenues of contracts negotiated prior to dissolution or the revenues from contracts in existence at the date of dissolution until the expiration of those contracts.

The following additional facts are necessary to resolve this issue. At trial, the plaintiffs argued that they were entitled to the profits earned from contracts negotiated during the existence of the partnership, RGS, and received after the dissolution of the partnership. The defendants claimed that after they dissolved the partnership, the plaintiffs were no longer entitled to any money received because of the October 11, 1982 letter, signed by both parties. The trial court found "(1) that because of the specific wording of the October 11, 1982 letter, the defendants had the absolute right to terminate the partnership at any time and that they exercised this right in July, 1984; (2) that the agreement of October 11, 1982, provides for the respective rights of the partners to this partnership, RGS, upon dissolution

because it specifically states that in the event of dissolution, neither RGS nor WSI would 'receive or maintain any rights whatsoever to RGI products'; (3) that in addition, by reason of the nature of the royalty payments due RGI, the contracts with the users set forth the terms of payment, but did not oblige the user to take any specified amount of product in the future and, therefore, when the partnership was dissolved, the plaintiffs, as selling agents, had no right to share in future royalties; (4) that the plaintiffs failed to prove that their efforts in negotiating contracts resulted in royalties received after the date the partnership was dissolved, whereas the defendants successfully demonstrated that they negotiated the terms of a new contract with Zenith effective October 8, 1984, and that royalties received from [Digital Equipment Corporation] were a product of negotiations they conducted in 1985 . . . ." In its supplemental memorandum of decision dated January 2, 1996, the trial court again declined to award the plaintiffs any revenue received from the Zenith contract after the dissolution of the partnership and before the termination of the contract.

The plaintiffs argue that this case is analogous to *Messina* v. *Calandro*, 214 Conn. 596, 572 A.2d 1012 (1990). In *Messina*, the plaintiff and the defendant formed a partnership to acquire property and seek zoning approval for the building of condominiums. Id., 597. After the defendant had begun site preparation, he terminated the partnership and subsequently built and sold condominiums. Id., 598. The plaintiff brought suit for an accounting. Id. Our Supreme Court analogized the situation to the dissolution of a law partnership. "Thus, just as an attorney, after the dissolution of a law partnership, has the right to his pro rata share of fees received from a case that was brought into the partnership prior to its dissolution, the plaintiff, in this case, has the right to his share of the profits from the sale of the

condominiums as contemplated by the partnership agreement." Id., 601.

The trial court appears to place great weight on the October 11, 1982 letter, especially the statement, "In the event that RGI desires to end the sale of its products through RGS, neither RGS nor [WSI] receive or maintain any rights whatsoever to RGI products." We do not interpret this to mean that the plaintiffs agree to forgive their right to future revenue received from contracts negotiated prior to the dissolution.

"A partner has been held entitled to his proportionate share of the net profits realized on the completion of projects which were commenced or planned prior to the dissolution of the partnership, including commissions payable to the partnership for its services despite their accrual after dissolution." 59A Am. Jur. 2d, Partnership § 1034 (1987).

The trial court incorrectly rejected the plaintiffs' claim for their share of the revenues generated by the contracts in place, and by contracts negotiated prior to the dissolution of the partnership and revenues received after the dissolution.

### III

The plaintiffs' final claim on appeal is that the trial court improperly allocated the partnership expenses. The plaintiffs argue that because the partnership agreement did not specify how expenses were to be allocated, they should be divided in the same proportion as the profits. In addition, the plaintiffs argue that the court improperly allocated to them the expense of purchasing stock in a certain corporation, TUII, certain legal fees, costs associated with diskettes and manuals, and certain advertising fees.

The trial court's decision as to the allocation of expenses was made in two memoranda of decision,

dated June 21, 1995, and January 2, 1996. In the first memorandum, the trial court concluded: "(8) that the partnership agreement failed to specify the division of expenses between the parties, but that it is equitable to follow the prior practice of the parties in which each was responsible for its own expenses, rather than basing the allocation of expenses on the respective percentage of gross revenues received by the parties."

After the trial court's decision was rendered, the defendants moved for reargument or articulation on several issues involving the accountings submitted by both parties. After the defendants' motion was granted, oral argument was heard and supplemental briefs were filed by each party addressing specific questions of the trial court. The issues in dispute concerned the allocation of TUII stock, certain legal fees, advertising expenses, and the cost and number of diskettes and manuals.

In the trial court's supplemental memorandum of decision of January 2, 1996, the court adopted the defendants' accounting to resolve the dispute. As to the TUII stock, the court concluded that the evidence indicated that the stock was purchased by the plaintiffs with their own money, held in their own name and ultimately sold by them for their own benefit. Therefore, the defendants were not to be charged with the purchase of this stock. The court concluded that the legal fees of the law firm of Kleban and Samor were for the benefit of the partnership and divided them evenly. The court decided that there were a total of 1622 GrafTalk diskettes and manuals, as well as 311 programs other than GrafTalk with a total cost of $68,345, for which the defendants were entitled to reimbursement. Advertising expenses were also divided equally between both parties.

"Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review.

The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *United Components, Inc.* v. *Wdowiak*, 239 Conn. 259, 263, 684 A.2d 693 (1996)." (Internal quotation marks omitted.) *In re Michael A.*, 47 Conn. App. 105, 109, 703 A.2d 1146 (1997). " 'We do not examine the record to determine whether a trier of fact could have reached a conclusion other than the one reached.' " *D'Angelo* v. *McGoldrick*, 239 Conn. 356, 364, 685 A.2d 319 (1996).

At trial, each party entered into evidence its own accounting of the partnership and represented to the court that its accounting was the proper way to deal with certain expenses. The plaintiffs' version admittedly borrowed from the defendants and, except in a few areas, was identical. In selecting the defendants' accounting, the trial court chose to believe the defendants' version and not that of the plaintiffs. Having reviewed the evidence, we cannot say that the trial court's decision with regard to the allocation of expenses was clearly erroneous. There was evidence to support the decision, and this court is not left with the definite and firm conviction that the trial court has made a mistake. We affirm the trial court's decision as to the allocation of advertising expenses, the cost of diskettes and manuals, legal fees and the ownership of the TUII stock.

## IV

In their cross appeal, the defendants allege that the trial court should have found that the plaintiffs

breached their fiduciary duty to the defendants.[10] The defendants disagree with the following findings of the trial court from its June 21, 1995 memorandum of decision: "(5) that neither the claim of the defendants, as set forth in their counterclaim, that the plaintiffs wrongfully terminated the partnership, RGS, by virtue of their scheme to wrest control of RGI from Theys and Fazio, nor the claim that the plaintiffs breached their fiduciary duties have been proved, and hence the provisions of the Uniform Partnership Act, General Statutes §§ 34-70 and 34-76, relating to partners who have caused a 'dissolution wrongfully,' are not applicable . . . (7) that the agreement by the plaintiffs to infuse RGS with $100,000 for advertising purposes was contingent upon Stahl and Goodman receiving an interest in RGI, which never materialized, or alternatively, merely constituted nonbinding plans for the future."

In reviewing the trial court's factual findings, this court again follows the clearly erroneous standard. "Under familiar principles of appellate review, a trial court's factual finding will not be reversed or modified unless it is clearly erroneous in view of the evidence and pleadings in the whole record. Practice Book § 4061 . . . . *Capital Consulting Group, Ltd.* v. *Rochman*, 218

---

[10] The defendants' approach to this claim includes the following arguments: (1) the trial court's decision contains a fatal inconsistency; (2) the plaintiffs' unwelcome takeover attempt was a per se breach of their fiduciary duty; (3) the attempted takeover was a fraudulent swindle; (4) the plaintiffs' takeover methods were sly, deceitful and false; (5) the defendants produced a "smoking gun" witness; (6) the plaintiffs' $100,000 advertising offer was not originally contingent on getting a stock interest in RGI; (7) the court failed to recognize that the $100,000 offer was the bait on the plaintiffs' takeover hook; (8) the plaintiffs' used duress in their takeover campaign; (9) the plaintiffs secretly converted partnership property; (10) the court overlooked the negative inference from the plaintiffs' failure to call Dorfsman as a witness; (11) Stahl and Goodman are individually liable for fraud as WSI agents; (12) Stahl and Goodman, as principals, also had a direct fiduciary relationship with the defendants; and (13) the plaintiffs' conduct "caused the dissolution wrongfully" within the meaning of General Statutes § 34-76.

Conn. 396, 401, 589 A.2d 877 (1991), quoting *DiBella* v. *Widlitz*, 207 Conn. 194, 198, 541 A.2d 91 (1988)." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Marland*, 45 Conn. App. 352, 359, 696 A.2d 374, cert. denied, 243 Conn. 907, 701 A.2d 328 (1997).

## A

In the defendants' brief, they argue that the trial court's June 21, 1995 memorandum of decision contains a "fatal inconsistency" in that the court stated: "The defendants also testified at length about the Machiavellian plan of Stahl and Goodman to take control of their company, RGI, and their testimony in this regard is essentially accepted," and then went on to make conclusions against the defendants. The defendants argue that by stating that their testimony is essentially accepted, the court then had no other choice but to find in their favor. We disagree.

The trial court's decision further states: "All it means, however, is that Stahl and Goodman saw a successful company, RGI, and decided that they would like to take it over if possible or at least participate in its success. Negotiations ensued, which ultimately took a bitter turn and were terminated. Thus, the plaintiffs' efforts to take over RGI were successfully thwarted by the defendants, but this does not mean that the plaintiffs acted illegally or wrongfully, and it does not follow that the plaintiffs' conduct caused the partnership to be dissolved as claimed by the defendants." Apparently, the defendants feel that their testimony is open to only one interpretation and, because the trial court did not accept that interpretation, the court has erred. This is not the case. The evidence presented and accepted by the trial court is not limited to one interpretation. Upon our review of the entire record, we conclude that the trial court's finding is not clearly erroneous.

## B

The defendants also argue that the plaintiffs' unwelcome takeover attempt was a per se breach of their fiduciary duty. The trial court's conclusion that the plaintiffs did not act wrongfully or illegally defeats this claim. Again, a review of the evidence before the trial court does not create a definite or firm conviction in this court that a mistake has been committed.

## C

The defendants claim that the plaintiffs breached their fiduciary duty when they offered the defendants $100,000 for advertising in exchange for making RGS, RGI's exclusive sales agency. The plaintiffs argue that the offer was merely part of ongoing negotiations that evolved from a discussion over the structure of the partnership to negotiations regarding bringing WSI into RGI. The trial court concluded that the money was contingent on Stahl and Goodman's obtaining an interest in RGI or, alternatively, was a nonbinding plan for the future. On appeal, the defendants claim that there is no evidence to support this conclusion. We disagree.

The defendant Fazio testified that "at the beginning of our talks, [Stahl] and I were supposed to sit down together and talk out the terms of the partnership, the way to make the partnership work, make it an exclusive arrangement with RGI. And in exchange we were going to get this $100,000. And he said, you know, [WSI's] got so much money, and [Stahl] was personally rolling in money, $100,000 wasn't a problem, don't worry, he could do it. In exchange for which he wanted this exclusivity from [RGS]. And we sat down to negotiate that starting in 1983." This testimony as well as that which followed does not stand for the proposition that the defendants assert, that there was a binding agreement in early 1983, which would give the defendants $100,000 for advertising in exchange for an exclusive sales

arrangement for RGS. The testimony merely states that this was the beginning of negotiations, the same negotiations that the trial court found to have eventually deteriorated. We cannot say that the trial court's finding is clearly erroneous.

## D

The defendants make a number of additional arguments in support of their claim that the plaintiffs breached their fiduciary duty. See footnote 10. The trial court's memorandum of decision concludes that only the defendants' claim of a breach of fiduciary duty has not been proved. In their motion for reconsideration, reargument and articulation dated June 30, 1995, the defendants requested that the trial court articulate its decision on this issue. The trial court denied the defendants' motion as to this point on July 7, 1995. The defendants then did nothing to perfect the record. The proper procedure for the defendants to have followed was to file a motion for articulation pursuant to Practice Book § 4051, now Practice Book (1998 Rev.) § 66-5.[11]

---

[11] Practice Book § 4051, now Practice Book (1998 Rev.) § 66-5, provides: "A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable. Any motion filed pursuant to this section shall state with particularity the relief sought. An original and three copies of such motion *shall be filed with the appellate clerk.* Any other party may oppose the motion by filing an original and three copies of an opposition with the appellate clerk within ten days of the filing of the motion for rectification or articulation.

"The appellate clerk shall forward the motion for rectification or articulation and the opposition, if any, to the trial judge who decided, or presided over, the subject matter of the motion for rectification or articulation for a decision on the motion. If any party requests it and it is deemed necessary by the trial court, the trial court shall hold a hearing at which arguments may be heard, evidence taken or a stipulation of counsel received and approved. The trial court may make such corrections or additions as are necessary for the proper presentation of the issues raised or for the proper presentation of questions reserved. The trial judge shall file the decision on the motion with the appellate clerk.

Even if we were to give the defendants the benefit of the doubt by their attempt to seek articulation through their June 30, 1995 motion, they still failed to file a motion for review pursuant to Practice Book § 4054, now Practice Book (1998 Rev.) § 66-7.[12]

"Our rules provide a procedure for clarifying the record when rulings of the trial court are unclear. Practice Book § 4051." *Buchetto* v. *Haggquist*, 17 Conn. App. 544, 548, 554 A.2d 763, cert. denied, 211 Conn. 808, 559 A.2d 1141 (1989). In addition, our rules provide a procedure for reviewing the adequacy of the trial court's

"Nothing herein is intended to affect the existing practice with respect to opening and correcting judgments and the records on which they are based. The trial judge shall file any such order changing the judgment or the record with the appellate clerk.

"Corrections made before the record is prepared shall be included in it. If the record has been prepared, the appellate clerk may prepare a supplemental record, to be distributed in the same way as the original record.

"The sole remedy of any party desiring the court having appellate jurisdiction to review the trial court's decision on the motion filed pursuant to this section or any other correction or addition ordered by the trial court during the pendency of the appeal shall be by motion for review under Sec. 4054.

"Upon the filing of a timely motion pursuant to Sec. 4040, the appellate clerk may extend the time for filing briefs until after the trial court has ruled on a motion made pursuant to this section or until a motion for review under Sec. 4054 is decided.

"Any motion for rectification or articulation shall be filed within thirty-five days after the delivery of the last portion of the transcripts or, if none, after the filing of the appeal, or, if no memorandum of decision was filed before the filing of the appeal, after the filing of the memorandum of decision. The thirty-five day deadline may be extended for good cause. No motion for rectification or articulation shall be filed after the filing of the appellant's brief except for good cause shown.

"A motion for further articulation may be filed by any party within twenty days after issuance of notice of the filing of an articulation by the trial judge. A motion for extension of time to file a motion for articulation shall be filed in accordance with Sec. 4040." (Emphasis added.)

[12] Practice Book § 4054, now Practice Book (1998 Rev.) § 66-7, provides in relevant part: "Any party aggrieved by the action of the trial judge as regards . . . articulation under Sec. 4051 may, within ten days of the issuance of notice of the order sought to be reviewed, make a written motion for review to the court, to be filed with the appellate clerk, and the court may, upon such a motion, direct any action it deems proper. . . ."

response to a motion for articulation. Practice Book § 4054, now Practice Book (1998 Rev.) § 66-7. "When a party is dissatisfied with the trial court's response to a motion for articulation, he [or she] may, and indeed under appropriate circumstances he [or she] must, seek immediate appeal . . . to this court via a motion for review." (Internal quotation marks omitted.) *State* v. *One 1993 Black Kenworth Truck*, 41 Conn. App. 779, 789, 679 A.2d 13 (1996), quoting *Buchetto* v. *Haggquist*, supra, 549.

"Even if we assume the validity of this claim, proper utilization of the motion for articulation [and the motion for review] serves to dispel any such ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." *Barnes* v. *Barnes*, 190 Conn. 491, 494, 460 A.2d 1302 (1983). " 'The burden of securing an adequate record for appellate review of an issue presented on a cross appeal rests with the cross appellant. *Niles* v. *Niles*, 9 Conn. App. 240, 249, 518 A.2d 932 (1986).' " *Anderson* v. *Schieffer*, 35 Conn. App. 31, 45, 645 A.2d 549 (1994). "Because it is the [cross] appellant's responsibility to provide this court with an adequate record for review . . . we will not remand a case to correct a deficiency the [cross] appellant should have remedied." ((Internal quotation marks omitted.) *State* v. *One 1993 Black Kenworth Truck*, supra, 41 Conn. App. 789; *Buchetto* v. *Haggquist*, supra, 17 Conn. App. 549; *Barnes* v. *Barnes*, supra, 494.

In this case, by filing their motion for reconsideration, reargument and articulation dated June 30, 1995, the defendants clearly demonstrated their recognition that the trial court's memorandum of decision would benefit from clarification with respect to a number of arguments they now make on appeal. "Without an adequate record, we can only speculate as to the basis for the trial court's decision. Our role is not to guess at possibilities, but to review claims based on a complete factual

record developed by a trial court." (Internal quotation marks omitted.) *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 543, 651 A.2d 1302 (1995). We therefore decline to review this claim because the defendant has not provided us with an adequate record.

V

The defendants next allege that the trial court improperly failed to find that the plaintiffs caused the demise of RGI and $1.5 million in damages to the defendants.

The trial court concluded "(6) that more specifically, the defendants failed to prove that the demise of RGI was the fault of the plaintiffs, as a change in market conditions or lack of business acumen on the part of Theys and Fazio could have been the reason for their company's fate."

In their cross appeal, the defendants argue that the plaintiffs' takeover efforts paralyzed RGI, and that RGI's lack of advertising resulted from the paralysis and resulted in a loss of the marketing opportunities that existed in the personal computer software market from the middle of 1983 to the middle of 1985. The defendants' attempt to blame the plaintiffs for their misfortune is misplaced. The defendants' testimony indicated that although they believed this marketing opportunity existed, they did nothing other than negotiate with the plaintiffs concerning funding for advertising. Further, the defendant Fazio's testimony indicated that the defendants realized they could have approached a bank for a loan for advertising but never did so. Again, on our review of the entire record, we cannot say that the trial court's finding that the plaintiffs were not responsible for the demise of RGI was clearly erroneous.

VI

The defendants also claim that the trial court improperly denied their motion to amend their pleadings, and

declined to award them prejudgment interest. After the trial court's supplemental memorandum of decision of January 2, 1996, the defendants sought to amend their pleadings to argue additionally that Stahl and Goodman should be individually liable for the accounting debt, and that the corporate veil of WSI should be pierced. In its August 23, 1996 supplemental memorandum of decision, the trial court denied the defendants' motion.

"A trial court has wide discretion in granting or denying amendments to the pleadings and rarely will [a reviewing] court overturn the decision of the trial court." (Internal quotation marks omitted.) *Capitol Restorations Corp.* v. *Construction Services of Bristol, Inc.*, 25 Conn. App. 681, 685, 596 A.2d 927 (1991). The trial court refused to allow the amendment because it was clear throughout the proceedings that the parties involved in this partnership accounting were WSI and RGI. There was no proof at trial that the parties were other than WSI and RGI. In addition, the trial court stated that the defendants' contention that the corporate veil of WSI should be pierced represented a new claim that was not based on any allegations in the pleadings or on any evidence introduced at trial, and that this claim was an afterthought of the defendants. "An appellate court will not interfere with the decision of a trial court not to permit an amendment unless an abuse of discretion is clearly evident." (Internal quotation marks omitted.) Id. We conclude that under the circumstances of this case, there was no such abuse of discretion.

In addition, the defendants argue in their cross appeal that the individual plaintiffs are severally liable in the accounting action for the $72,213 overdraft. This claim is without merit as it involves the accounting between WSI and RGI.

We also find that the trial court did not abuse its discretion in failing to award prejudgment interest

because the reasons stated were consistent with the discretion given to it by General Statutes § 37-3a.

## SUMMARY

The trial court correctly granted the motion for summary judgment on count four of the plaintiffs' complaint, and properly allocated expenses between WSI and RGI. The court correctly rejected the defendants' special defense, counterclaim and claim for setoff. The judgment must be reversed, however, as to the granting of the motion for summary judgment on count one, only as to estoppel, and counts two, three and five. Further, the trial court incorrectly determined that the plaintiffs were not entitled to revenues generated on contracts negotiated and contracts in effect at the time of the dissolution and, therefore, the accounting must be reversed because WSI's entitlement to its share of revenues generated on contracts in existence and negotiated prior to the dissolution of RGS will have an effect on the accounting.

The judgment is reversed as to the granting of the defendants' motion for summary judgment on count one, only as to estoppel, and on counts two, three and five; the judgment is reversed as to the accounting on count six, and the case is remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

In this opinion the other judges concurred.