# HI-HO TOWER, INC. *v.* COM-TRONICS, INC., ET AL.
## (SC 16227)

McDonald, C. J., and Borden, Palmer, Sullivan and Parker, Js.

Argued April 20—officially released December 12, 2000

*Ralph P. Dupont,* with whom was *Barbara J. Rad-lauer,* for the appellant (plaintiff).

*David B. Zabel,* with whom, on the brief, was *Vincent M. Marino,* for the appellees (defendants).

*Opinion*

BORDEN, J. The plaintiff, Hi-Ho Tower, Inc., appeals[1] from the judgment of the trial court, rendered after a jury trial, in favor of the defendants, Com-Tronics, Inc. (Com-Tronics), and its principal officer, John Becker, on the complaint, and for Com-Tronics on the third

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

count of its counterclaim. The plaintiff claims that the trial court improperly: (1) instructed the jury as to the elements of a claim for tortious interference with business expectancies, and denied the plaintiff's motion for judgment notwithstanding the verdict on Com-Tronics' counterclaim for tortious interference; (2) granted the defendants' motion for a directed verdict on the plaintiff's claim of breach of fiduciary duty; and (3) instructed the jury that conversion and statutory theft are limited to tangible property and documents evidencing intangible rights. We affirm the judgment.

The plaintiff brought this action against the defendants in two counts seeking, on the basis of various legal theories including breach of fiduciary duty, damages for the defendants' alleged unlawful use of the plaintiff's radio and communications tower. Com-Tronics filed a four count counterclaim. The trial court directed a verdict for the defendants on the claim of breach of fiduciary duty. The jury returned a verdict for the defendants on all remaining counts of the complaint, and for Com-Tronics on the third count of its counterclaim, which was based on the theory of tortious interference with business expectancies.[2] The trial court rendered judgment on the verdict.

The jury reasonably could have found the following facts. The plaintiff, a wholly owned subsidiary of D'Addario Industries, Inc. (D'Addario Industries), is a corporation engaged in the business of owning, operating and maintaining a communications tower and facility in the town of Trumbull. The facility consists of the tower, an equipment building, cable and electrical wiring, and numerous repeaters and antenna combiners[3] used in

---

[2] The jury returned a verdict for the plaintiff on all remaining counts of Com-Tronics' counterclaim.

[3] A repeater is a radio receiver and transmitter. A community repeater is a radio receiver and transmitter that can be used by multiple subscribers. An antenna combiner is a piece of equipment that allows more than one repeater to use the same antenna.

the transmission and reception of radio signals. The plaintiff licenses various entities to use its communications facilities for television, radio and wireless telephone services.

The defendants are engaged in the business of selling, servicing and installing two-way radio equipment. In the early 1980s, Becker began to service communications equipment for the plaintiff and various other entities operated by D'Addario Industries.

In 1982, Becker contacted F. Francis D'Addario, then president of the plaintiff, and requested permission, which was granted, to install a community repeater at the plaintiff's tower facility for use in Com-Tronics' business.[4] In exchange, Becker paid a monthly usage fee of $25.[5] Sometime either prior to or during 1989, the parties entered into an oral agreement whereby the defendants would furnish technical assistance and service functions at the tower.

It is undisputed that from 1982 through 1992, the defendants installed additional repeaters and antenna combiners on the plaintiff's tower for the defendants' use, licensed their customers to use the repeaters and combiners, and collected license fees for that use. In the plaintiff's equipment building adjacent to the tower, the defendants' customers placed their own equipment, which was subsequently wired to the additional repeaters and combiners that the defendants had installed on the tower. The parties dispute, however, whether the plaintiff was aware of the installation of these additional items or of the defendants' licensing activities and collection of licensing fees, and whether the defendants had permission from the plaintiff for these activities.

[4] Although the parties contemplated executing a written standard usage agreement, no such agreement was ever executed.

[5] In 1989, the plaintiff waived the monthly fee in exchange for service work to be rendered by the defendants at the tower.

The defendants' conduct in placing the additional repeaters and combiners on the plaintiff's tower and in using the tower for their own benefit form the basis for the plaintiff's claim, in its complaint, that the defendants unlawfully used the tower.

As part of their business, the defendants provided technical services for both the plaintiff's and the defendants' customers whose equipment was located at the plaintiff's tower facility. This part of Com-Tronics' business forms the basis of its counterclaim for tortious interference.

In August, 1992, the plaintiff was contacted by the Federal Communications Commission (commission) regarding communications interference with area television and radio reception due to increased use of the tower facility. The plaintiff hired a consultant, Thomas Osenkowsky, to conduct an investigation of the commission's allegations. In preparation for the investigation, the plaintiff asked Becker to compile a list of customers who were utilizing the tower's communications facilities. The list prepared by Becker included Com-Tronics' equipment located at the tower. At the conclusion of the investigation, Osenkowsky determined that the list compiled by Becker accurately reflected all equipment located at the tower.

In September, 1992, David D'Addario, the president of D'Addario Industries,[6] met with Becker and demanded that the defendants turn over all of the defendants' equipment at the tower to the plaintiff, and reimburse the plaintiff for revenues lost as a result of the defendants' alleged unauthorized use of the plaintiff's tower facility. On September 22, 1992, the plaintiff sent a letter to all tower customers for whom the defendants

---

[6] David D'Addario, the son of F. Francis D'Addario, became president and chief executive officer of D'Addario Industries upon his father's death in 1986.

provided maintenance and repair services, stating that the defendants no longer were associated with or had access to the tower. Additional facts will be provided as necessary.

Thereafter, the plaintiff brought this action against the defendants. The first count of the plaintiff's complaint claimed damages based on three theories: (1) breach of fiduciary duty; (2) breach of contract; and (3) common-law conversion and statutory theft. The second count claimed damages under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Com-Tronics, in addition to pleading special defenses, filed a four count counterclaim alleging: (1) breach of agreement; (2) unjust enrichment; (3) tortious interference with existing and prospective business expectancies due to the plaintiff's wrongful denial of access to the tower, including resulting lost profits from work performed for various tower customers as part of the defendants' technical assistance responsibilities at the tower; and (4) violation of CUTPA.[7]

At the close of the plaintiff's case, the trial court directed a verdict in favor of the defendants on the plaintiff's claim of breach of fiduciary duty. After Com-Tronics had presented its evidence on its counterclaim, the trial court denied the plaintiff's motion for a directed verdict on the counterclaim. The remaining issues were submitted to the jury by way of interrogatories. The jury returned a verdict for the defendants on all remaining

[7] As noted previously, the trial court directed a verdict for the defendants on the plaintiff's claim of breach of fiduciary duty. The jury returned a verdict for the defendants on the remaining counts of the plaintiff's complaint, and for Com-Tronics on the third count of its counterclaim, which was based on the theory of tortious interference with business expectancies. Only the first count of the plaintiff's complaint, specifically, its theories for breach of fiduciary duty, conversion and statutory theft, and the third count of Com-Tronics' counterclaim, namely, its claim for tortious interference, are involved in this appeal.

counts of the complaint, for Com-Tronics on the third count of its counterclaim, namely, tortious interference, and for the plaintiff on the remaining counts of Com-Tronics' counterclaim.

In connection with the third count of Com-Tronics' counterclaim, however, the court bifurcated the question of punitive damages. After the jury rendered a verdict for Com-Tronics on the third count of its counterclaim, but awarded damages of $0, the trial court, over the objection of the plaintiff, submitted the question of punitive damages to the jury with supplementary instructions. The jury then rendered a verdict of $120,000 in punitive damages.

The trial court denied the plaintiff's motions: (1) for a directed verdict as to the issue of punitive damages; (2) to set aside the verdict on the complaint, and on the counterclaim for tortious interference; (3) for judgment notwithstanding the verdict or a new trial on the counterclaim for tortious interference and the punitive damage award; and (4) for a remittitur as to the punitive damage award. The trial court rendered judgment accordingly. This appeal followed.

## I

The plaintiff first claims that the trial court improperly instructed the jury as to the elements of a claim for tortious interference with business expectancies and, furthermore, improperly denied the plaintiff's motion for a directed verdict on Com-Tronics' counterclaim for tortious interference because Com-Tronics failed to prove actual loss and recovered punitive damages in the absence of an award of compensatory damages. Because we perceive the plaintiff's claims to raise two distinct issues, we consider them in turn.

## A

We first consider the plaintiff's claim that the trial court improperly instructed the jury as to the elements

of a claim for tortious interference with business expectancies. Specifically, the plaintiff argues that the trial court improperly charged the jury that the law required Com-Tronics to prove only that it suffered a loss to prevail on its claim for tortious interference. We disagree.

We review the plaintiff's claim in light of the well established rule that "jury instructions are to be read as a whole, and instructions claimed to be improper are read in the context of the entire charge. . . . A jury charge is to be considered from the standpoint of its effect on the jury in guiding it to a correct verdict. . . . The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Jury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." (Citations omitted; internal quotation marks omitted.) *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 219–20, 653 A.2d 798 (1994).

We conclude that the trial court properly charged the jury with respect to the requisite elements of the tort of unlawful interference with business expectancies. It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. *Solomon* v. *Aberman*, 196 Conn. 359, 364, 493 A.2d 193 (1985); *Herman* v. *Endriss*, 187 Conn. 374, 377, 446 A.2d 9 (1982); *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.*, 169 Conn. 407, 415, 363 A.2d 86 (1975).

At trial, Com-Tronics claimed that, for the reasonable period of five years after September, 1992, when the plaintiff interfered with its business expectancies, it suffered lost profits on the business of repairs and maintenance of the equipment of customers located at the tower who used the services of Com-Tronics. Com-Tronics did not claim any loss of license or other revenue related to the operation of its repeater and combiner business. In support of its claim for lost profits, Com-Tronics introduced evidence that, from 1987 to 1992, it received revenues averaging $15,000 per year from service work for customers at the tower, not including the plaintiff, and that, based on its general profit margin of 29 percent for the period from 1993 to 1997, its lost profits for a period of five years from 1992 were approximately $21,000. The plaintiff, on the contrary, contended that this evidence was insufficient to establish Com-Tronics' lost profits with reasonable certainty because it did not take into account the cost of labor to render the particular services claimed to have been prevented and the costs of the particular goods claimed not to have been sold as a result of the plaintiff's allegedly wrongful conduct.

The trial court instructed the jury that "what [Com-Tronics] seeks here is lost profits from service revenue for five years, September, 1992, the date of the letter, to September, 1997, from companies whose equipment at the Tower or on the Tower, was serviced or would have been serviced by Com-Tronics. This claim therefore is not about repeater customers but about service customers other than the Tower itself . . . ." The trial court also instructed the jury accordingly that it must find "by [a] preponderance of the evidence that Com-Tronics . . . suffered damages as a result of the plaintiff's actions." The court further charged that such a loss was "an essential element of [Com-Tronics'] claim for tortious interference," and that, as to that essential

element, Com-Tronics was required to prove with "[r]easonable certainty" its "lost profits. That is, what its income above expenses would have been with respect to the revenue lost."[8]

[8] The full jury instruction regarding Com-Tronics' counterclaim for tortious interference provides the following: "Now, we're down to [Com-Tronics'] fourth counterclaim which you may be happy to see is last on that large chart. This is the claim that the [plaintiff] committed tortious interference with existing and prospective relationships of Com-Tronics. This claim is largely based upon the letter said to have been sent by the [plaintiff] to companies that Com-Tronics dealt with. You'll recall that there was an Exhibit L. I don't read to you from this letter merely to place any special emphasi[s] on it except to point out to you that this is apparently the heart of the tortious interference claim as I understand. It's the letter of September of 1992, September 22nd, in which [Alan] Perry having signed it, says effective September 18th, John Becker doing business as Com-Tronics is no longer associated with [the plaintiff] and does not have access to the Tower. Any tenant that requires service or information may contact me at 335-0101.

"Now, here's what . . . [the] defendant Com-Tronics has alleged in its language of this complaint. [It] say[s] that [the plaintiff] intentionally interfered with the existing and prospective business relationships between Com-Tronics and its customers and prospective customers at the Tower, in that [the plaintiff] notified customers and prospective customers of Com-Tronics that Com-Tronics was not permitted to gain access to the Tower for the purpose of installing or servicing equipment at the Tower. And [the plaintiff] barred Com-Tronics Incorporated from gaining access to the Tower for [the] purpose of installing or servicing equipment at the Tower, thereby preventing Com-Tronics from continuing to render services for customers and prospective customers who had equipment located at the Tower.

"Now what [Com-Tronics] seeks here is lost profits from service revenue for five years, September, 1992, the date of the letter, to September, 1997, from companies whose equipment at the Tower or on the Tower, was serviced or would have been serviced by Com-Tronics. This claim therefore is not about repeater customers but about service customers other than the Tower itself, okay.

"To prevail on its claim of tortious interference with existing and prospective business relationships, Com-Tronics must prove by a preponderance of the evidence that there were existing, contractual or business relationships between customers and Com-Tronics, or the reasonable prospect of such contractual or business relationship[s] with prospect[ive] customers for services to be rendered by Com-Tronics at the Tower.

"Number two, that the plaintiff intentionally interfered with those existing or prospective relationships.

"Number three, that the interference was tortious, that is that [the] plaintiff was guilty of fraud, misrepresentation, intimidation or molestation or

acted maliciously.

"What's malice? The intentional doing of a wrongful act without just cause or excuse with an intent to inflict an injury or implied evil intent.

"And the fourth element of tortious interference is that Com-Tronics suffered a loss as a result of the plaintiff's actions. Com-Tronics must prove in this cause of action that the plaintiff . . . was improperly motivated in its actions. And that the interference by the plaintiff was wrongful by some measure beyond the fact of the interference itself. Now, obviously all interference by one business entity with another such as competition between competitors or related business entities is not illegal. It's for you to determine whether the alleged interference by the [plaintiff] in this case was improper and tortious, using the rules I've given to you. In determining whether the [plaintiff's] conduct was improper and tortious you should consider the nature of the [plaintiff's] conduct, the [plaintiff's] motive, the nature of the interests of Com-Tronics with which the [plaintiff] interfered. The interest which the plaintiff sought to advance by its actions. The social interests, if any, in protecting the freedom of action of the plaintiff . . . and the contractual or business interests of Com-Tronics. The proximity or remoteness of the plaintiff's actions to the interference and the relations between the parties.

"Now that's an awful lot to determine. Now I think I have to tell you here about—I think I've got a mismarked page here. Let me just take a look here. Yes, now it's not necessary for Com-Tronics to prove that the plaintiff interfered with a specific, written, legally enforceable contract that it had with someone else, a customer or a prospect[ive] customer. The law will make the assumption that even unenforceable promises will be carried out if no third person interferes. And the law does not restrict its protection to rights resting on enforceable, contractual relationship[s]. The law also forbids unjustifiable interference with any man's right to pursue his lawful business or occupation and to secure to himself the earnings of his industry.

"If you should find therefore, by preponderance of the evidence that Com-Tronics had existing or prospective contractual or business relationships with customers or prospective customers at the Tower, that the [plaintiff] knew about and that [the] plaintiff intentionally and tortiously interfered with those relationships, you must determine whether Com-Tronics suffered damages as a result of the plaintiff's actions. As I've stated, it's an essential element of its claim for tortious interference that Com-Tronics establishes such—some actual [loss]. There must be a reasonable degree of certainty that Com-Tronics would have received the benefits of business relationships from either existing or prospective customers at the Tower but for the tortious interference by the plaintiff. This cannot be left now to your surmise or conjecture or speculation but the damages do not have to [be] shown to an absolute mathematical certainty with regard, especially to prospective customers. Here Com-Tronics has asserted a claim for its lost profits and Com-Tronics is entitled to recover damage in the nature of lost profits. That is, what its income above expenses would have been with respect to the revenue lost. If it can establish the amount of such lost profits with a

This instruction was an accurate statement of the elements of a claim for tortious interference with business expectancies. The trial court instructed the jury that, in order to find for Com-Tronics, the jury must conclude that the plaintiff intentionally interfered with Com-Tronics' existing or prospective business relationships and that, as a result, Com-Tronics suffered an actual loss and could prove such loss to a reasonable degree of certainty. When read as a whole and in proper context, the instructions adequately informed the jury as to the correct legal standard and fairly presented to the jury the tools with which to gauge Com-Tronics' claim.

## B

Having concluded that the trial court properly instructed the jury regarding the elements of the tort of unlawful interference with business expectancies, we turn now to the plaintiff's second claim. The plaintiff argues that the trial court improperly denied its motion for judgment notwithstanding the verdict[9] on Com-

---

reasonable degree of certainty. Reasonable certainty is the test, no more, no less.

"Now, on this counterclaim for tortious interference, Com-Tronics also seeks punitive damages. Despite their name, damages under the common law in Connecticut are not for the purpose of punishing the party. Indeed they are used to compensate a party for the cost of bringing an action, including its attorney['s] fees if they're awarded. You can only award punitive damages in favor of Com-Tronics if you find from the evidence presented in this case that the plaintiff . . . had a reckless indifference to the rights of Com-Tronics or committed an intentional or wanton violation of Com-Tronics' rights.

"If you should find that Com-Tronics is entitled to punitive damages under the rules that I've given you, you should also indicate—you should so indicate on the verdict form that I'll be discussing with you and then later the amount of any such punitive damages would be determined in a separate proceeding or hearing with me, all right."

[9] Although the plaintiff has at times presented its challenge on appeal in terms of the trial court's improper denial of its motion for a directed verdict on Com-Tronics' counterclaim for tortious interference, the plaintiff's claim is more appropriately considered as a challenge to the denial of its motion for judgment notwithstanding the verdict. We therefore treat this claim of

Tronics' counterclaim for tortious interference where, according to the plaintiff, Com-Tronics failed to prove the essential element of actual loss and subsequently recovered punitive damages in the absence of an award of either compensatory damages or nominal damages. Com-Tronics, in response, asserts that the jury verdict in its favor on the tortious interference claim is equivalent to a finding that it suffered an actual loss, and thus the award of punitive damages is supported by the verdict. We agree with Com-Tronics.

Before reaching the merits of the plaintiff's argument, we briefly address the standard by which we review this claim. It is well established that "[o]ur review of a trial court's refusal to direct a verdict or to render judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial; *Bleich* v. *Ortiz*, 196 Conn. 498, 501, 493 A.2d 236 (1985); giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Citation omitted; internal quotation marks omitted.) *Ham* v. *Greene*, 248 Conn. 508, 519, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999).

As previously stated, in order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party;

---

the plaintiff as a challenge to the trial court's failure to grant its motion for judgment notwithstanding the verdict regarding Com-Tronics' counterclaim for tortious interference.

(2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss. *Solomon* v. *Aberman,* supra, 196 Conn. 364; *Herman* v. *Endriss,* supra, 187 Conn. 377; *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.,* supra, 169 Conn. 415. "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss; see *Riccio* v. *Abate,* 176 Conn. 415, 418–19, 407 A.2d 1005 (1979);[10] it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss. *Herman* v. *Endriss,* [supra, 377]; *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.,* [supra, 415]; *Goldman* v. *Feinberg,* 130 Conn. 671, 37 A.2d 355 (1944); 3 Dooley, Modern Tort Law § 44.03, p. 216; Prosser, Torts (4th Ed. [1971]) § 130, p. 953." *Taylor* v. *Sugar Hollow Park, Inc.,* 1 Conn. App. 38, 39, 467 A.2d 935 (1983).[11] "[P]roof that some

---

[10] In *Riccio* v. *Abate,* supra, 176 Conn. 416, the trial court rendered summary judgment for the plaintiff as to liability on her claim for negligence arising out of an automobile accident. Upon the hearing in damages, however, the trial court submitted a separate defendant's verdict form to the jury, and the jury rendered a verdict for the defendant, finding, in effect, that the plaintiff had not proven any damages flowing from the accident in question. Id., 417–18. On appeal, this court, although affirming the trial court's refusal to set the verdict aside, stated: "The court was wrong, however, in submitting the two separate verdict forms on the issue of damages to the jury for their consideration. The issue of liability had been previously decided by the court when it granted the plaintiff's motion for summary judgment, and, therefore, the jury had before them only a hearing in damages. The defendants were found liable by the court and the effect of their liability was to establish the fact that a technical legal injury had been done by them to the plaintiff, and this entitled the plaintiff to at least nominal damages. *Schmeltz* v. *Tracy,* 119 Conn. 492, 496, 177 A. 520 [1935]; *Dewire* v. *Hanley,* 79 Conn. 454, 458, 65 A. 573 [1907]; *Parker* v. *Griswold,* 17 Conn. 288, 302 [1845]. *Keller* v. *Carone,* 138 Conn. 405, 406–407, 85 A.2d 489 (1951); *Dimmock* v. *New London,* 157 Conn. 9, 15–16, 245 A.2d 569 (1968)." (Internal quotation marks omitted.) *Riccio* v. *Abate,* supra, 418–19.

[11] In *Taylor* v. *Sugar Hollow Park, Inc.,* supra, 1 Conn. App. 39, the plaintiff sought damages on allegations that the defendant had tortiously interfered with an existing business relationship. The trial court, despite finding that

damage has been sustained is necessary to [support a cause of action for tortious interference]." W. Prosser, supra, § 129, p. 948. "A major problem with damages of this sort, [however], is whether they can be proved with a reasonable degree of certainty. . . . If the question is whether the plaintiff would have succeeded in attaining a prospective business transaction in the absence of [the] defendant's interference, the court may, in determining whether the proof meets the requirement of reasonable certainty, give due weight to the fact that the question was 'made hypothetical by the very wrong' of the defendant. Sometimes, when the court is convinced that damages have been incurred but the amount cannot be proved with reasonable certainty, it awards nominal damages." Restatement (Second), Torts § 774A, comment (c) (1979). Thus, an award of compensatory damages is not necessary to establish a cause of action for tortious interference as long as there is a finding of actual loss, and a finding of actual loss may support an award of punitive damages. See *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 425–28, 682 A.2d 603, cert. denied, 239 Conn. 951, 686 A.2d 124 (1996), cert. denied, 520 U.S. 1213, 117 S. Ct. 1699, 137 L. Ed. 2d 825 (1997); *Ault* v. *Lohr*, 538 So. 2d 454, 456 (Fla. 1989) (jury finding of liability is equivalent to finding of damage; thus punitive damages may be assessed).

In the present case, the evidence was submitted to the jury with special interrogatories. With respect to Com-Tronics' counterclaim for tortious interference, the jury answered "Yes" to question 4, which asked the following: "Do you find that Com-Tronics, Inc. has proven by a preponderance that [the plaintiff] tortiously

the plaintiff "offered no credible evidence [of] actual damage," awarded the plaintiff $3500. Id. The Appellate Court reversed, and directed judgment for the defendant because "[t]he trial court's findings that the plaintiff did not prove actual damage . . . [was] fatal to [the plaintiff's] cause of action." Id., 39–40.

interfered with Com-Tronics' existing or prospective business relationships at the Tower?" Question 9 instructed the jury as follows: "If you answered 'Yes' to . . . Question 4 . . . please answer the following Question: What damages, if any, did Com-Tronics, Inc. prove by a preponderance that it suffered as a result of [the plaintiff's] tortious interference with Com-Tronics, Inc.'s existing or prospective business relationships . . . ?" The jury responded: "$0."

Question 10 also instructed the jury as follows: "If you answered 'Yes' to Question 4, please answer the following Question: Do you find that Com-Tronics, Inc. has proven by a preponderance that [the plaintiff] acted with reckless indifference to the rights of Com-Tronics, Inc., or committed an intentional and wanton violation of the rights of Com-Tronics, Inc., such that Com-Tronics, Inc. should recover punitive damages from [the plaintiff]?" The jury responded: "Yes." Question 11 instructed the jury regarding proof by Com-Tronics of damages as follows: "Please add the amount you entered in response to either Question 6 or Question 7 (you should only have entered an amount in response to one of those questions, not both) to the amount you entered in response to Question 9, and enter the result below." The jury responded: "$0."

With respect to Com-Tronics' claim for punitive damages, the court bifurcated liability and damages. The court instructed the jury that: "You can only award punitive damages in favor of Com-Tronics if you find from the evidence presented in this case that the plaintiff . . . had a reckless indifference to the rights of Com-Tronics or committed an intentional or wanton violation of Com-Tronics' rights. If you should find that Com-Tronics is entitled to punitive damages under the rules that I've given you, you should . . . so indicate on the verdict form that I'll be discussing with you and then later the amount of any such punitive damages

would be determined in a separate proceeding or hearing . . . ."

The special interrogatories then instructed the jury: "Please proceed to the Verdict Form." Consistent with these responses, the jury then completed the verdict form on the counterclaim as follows: "On the counterclaims of defendant Com-Tronics, Inc. against plaintiff Hi-Ho Tower, Inc., we the jury find: (A) In favor of defendant Com-Tronics, Inc., and against the plaintiff, and therefore find that Com-Tronics, Inc. should recover from the plaintiff: (1) damages in the amount of $0 . . . (2) punitive damages Yes . . . ."

The jury was then excused, and the parties and the court discussed the next course to follow. The plaintiff requested that, in view of the jury's specific findings of zero damages on the counterclaim, the jury should be instructed further to render a verdict for the plaintiff on the counterclaim for tortious interference. The court did not do so. Instead, the court then instructed the jury that it was the court's understanding from the jury's responses "that [the jury] found loss having been suffered by Com-Tronics, because actual loss is an element of tortious interference . . . ." The court also stated to the jury that "you had said yes that there was tortious interference, but you said no to [a] proven dollar amount [of] money damages. . . . Now, punitive damages may lie if you have found Com-Tronics suffered actual loss, *even though it may not be proven to you the dollar amount of damages with the required degree of certainty [by a] preponderance of the evidence. If your zero damage in Question 9 was intended to indicate that you believe there was no loss, calculable or not, that was shown to have been suffered at all, then when you state a punitive amount, it ought to be zero, because some actual loss, even if not calculable,* is an element of tortious interference . . . ." (Emphasis added.) The court then instructed the jury on the law

regarding how to calculate punitive damages. The jury returned with a punitive damages award of $120,000.

Thus, in this case, the jury was explicitly instructed that, if it did not find that Com-Tronics had suffered an actual loss, it should not award any punitive damages, but that if it found that Com-Tronics had suffered "some actual loss, even if not calculable," it should award punitive damages. In response, the jury awarded punitive damages. Unless there is evidence to the contrary, the jury is presumed to follow the court's instructions. *State* v. *Rouleau*, 204 Conn. 240, 254, 528 A.2d 343 (1987). After being properly instructed that proof of actual loss was an element of a claim for tortious interference, the jury found in favor of Com-Tronics. In light of the specific jury interrogatories and answers, we conclude that the jury found that Com-Tronics had suffered some actual loss, although its specific amount had not been proven. Accordingly, we "give due weight to the fact that the [specific amount of the loss] was 'made hypothetical by the very wrong' of the defendant." Restatement (Second), supra, § 774A, comment (c). Because the jury found that actual loss had been proven, the fact that Com-Tronics did not prove by a preponderance of the evidence the specific amount of the loss should not bar recovery of punitive damages in this case. We also reject the plaintiff's claim that the award of punitive damages cannot stand in the absence of an award by the jury of nominal damages. First, the jury was not instructed regarding nominal damages in accordance with the objection to such an instruction by the plaintiff. Second, as a general rule, this court "will not reverse and grant a new trial for a mere failure to award nominal damages." *Riccio* v. *Abate*, supra, 176 Conn. 419.

## II

We next consider the plaintiff's claim that the trial court improperly granted the defendants' motion for a

directed verdict on the plaintiff's claim of breach of fiduciary duty. The plaintiff argues that the trial court improperly concluded, as a matter of law, that a fiduciary duty can never arise in commercial transactions involving arm's-length dealings. The defendants contend that a fiduciary relationship did not exist between the parties because the parties were involved in an arm's-length transaction and neither party was under an obligation to act for the benefit of the other. We agree with the defendants.

It is well settled that "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) *Konover Development Corp.* v. *Zeller,* supra, 228 Conn. 219; *Dunham* v. *Dunham,* 204 Conn. 303, 322, 528 A.2d 1123 (1987); *Alaimo* v. *Royer,* 188 Conn. 36, 41, 448 A.2d 207 (1982); *Harper* v. *Adametz,* 142 Conn. 218, 225, 113 A.2d 136 (1955). Although this court has "refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations"; *Harper* v. *Adametz,* supra, 225; we have recognized that not all business relationships implicate the duty of a fiduciary. *Hemingway* v. *Coleman,* 49 Conn. 390, 391 (1881). In particular instances, certain relationships, as a matter of law, do not impose upon either party the duty of a fiduciary.

In the seminal cases in which this court has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another. In *Dunham* v. *Dunham,* supra, 204 Conn. 305, a younger brother brought an action against his older brother, an attorney who had represented the plaintiff and in whom the

plaintiff continuously placed his trust and confidence for both legal and nonlegal advice, challenging certain probate proceedings and inter vivos transfers of family property. We upheld the trial court's instruction to the jury that, on the basis of the evidence presented, in addition to legal malpractice, the jury could find that the defendant breached his fiduciary duty because the defendant stood in a position of trust and confidence, and the plaintiff relied upon him for both legal and nonlegal advice. Id., 321. Similarly, in *Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 218–19, we recognized that general and limited partners are "bound in a fiduciary relationship" and, as such, must act as trustees and represent the interests of each other.

In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence. For example, in *Hemingway* v. *Coleman*, supra, 49 Conn. 391, the defendant laborer was employed by the plaintiff's husband to care for the family's oyster beds and the parties eventually became friends. Subsequently, after the defendant had established his own business, the plaintiff approached the defendant seeking to sell the oyster beds. Id. The defendant knowingly offered the plaintiff less than one-half the market rate for the beds and the plaintiff accepted the offer. Id. The trial court set aside the conveyance but this court, concluding that no fiduciary duty existed, reversed the judgment of the trial court. Id., 392–93. We stated that the parties "were strangers and stood at arms length in the matter of contract . . . . [The defendant] had not by being a friend become the guardian of [the plaintiff's] interests in any such sense as to impose upon him a legal duty to sacrifice his own to theirs." Id., 392.

Similarly, in *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 717 A.2d 724 (1998), the plaintiff sued the defendant law firm and certain individual attorneys, including a partner, an associate and a contract lawyer, for malpractice in connection with the plaintiff's attempt to establish a business to franchise fitness clubs. The trial court rendered judgment for the plaintiff on five of the eight counts of the complaint, including the claim for breach of fiduciary duty. Id., 51. On appeal, we reversed the judgment in part, concluding that it was "improper for the trial court to conclude that [the associate's] professional negligence rose to the level of a breach of fiduciary duty." Id., 57. The associate did not represent to the plaintiff that she had "superior knowledge, skill or expertise in the field of franchising," and did not seek the plaintiff's "special trust." Id.

In the present case, a careful examination of the record reveals that the plaintiff and the defendants were parties to an arm's-length transaction, in which the defendants undertook to provide certain technical assistance and limited management services to the plaintiff and were allowed use of the plaintiff's tower facility. The defendants' management responsibilities at the tower included knowledge of the commission's regulations, repair and pricing information, and technical skills related to antenna height and tower load capacity. The plaintiff asserts several times in its brief that the defendants were the "sole technical advisors" to the plaintiff, that the plaintiff relied exclusively on the defendants for "information and knowledge as to the names of the persons using its tower and communication facility," and that the defendants "seized the [plaintiff's] business opportunity and profited from the trust and confidence placed in [the defendants] . . . ." Viewing the plaintiff's assertions in the light most favorable to it and drawing every reasonable inference there-

from, we conclude that, as a matter of law, the defendants did not owe the plaintiff the duty of a fiduciary.

The plaintiff failed to produce evidence of a " 'unique degree of trust and confidence between the parties' " such that the defendants undertook to act primarily for the benefit of the plaintiff. *Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 219. Furthermore, the record does not demonstrate that the plaintiff here, like the plaintiff in *Dunham*, relied or was dependent upon the defendants for the tower's operations. In fact, Alan Perry, then general manager of the plaintiff, testified that he, David D'Addario and the general counsel of the plaintiff retained control of the day-to-day operations at the tower, including access to the tower, customer relations and business transactions.

"The law will imply [fiduciary responsibilities] only where one party to a relationship is unable to fully protect its interests [or where one party has a high degree of control over the property or subject matter of another] and the unprotected party has placed its trust and confidence in the other." (Internal quotation marks omitted.) *Ward* v. *Lange*, 553 N.W.2d 246, 250 (S.D. 1996). Here, the parties were business entities that engaged in an arm's-length transaction, and there was no evidence that the plaintiff was unable to protect its interests.

Moreover, the plaintiff did not relinquish control of tower operations to the defendants. To the contrary, the defendants only managed limited aspects of the tower's communications facilities. "The fact that one business person trusts another and relies on [the person] to perform [its obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty." *Garrison Contractors, Inc.* v. *Liberty Mutual Ins. Co.*, 927 S.W.2d 296, 301 (Tex. App.

1996). Although the plaintiff relied on the defendants to perform and manage technical services at the tower as agreed between the parties, this reliance did not confer upon the defendants the authority to exercise over the plaintiff the control, dominance or influence characteristic of fiduciary relationships. Thus, we conclude that the record, as a matter of law, is inadequate to support a finding of a fiduciary relationship.

The plaintiff contends, nevertheless, that, as a result of the defendants' superior technical knowledge and skill regarding tower operations and repair, the plaintiff increasingly depended upon the defendants' expertise for the technical operation of its tower facilities and, therefore, the defendants were obligated to represent the interests of the plaintiff. Despite the plaintiff's assertions, the defendants' technical expertise did not convert the relationship between the parties from a business relationship into a fiduciary relationship. Superior skill and knowledge alone do not create a fiduciary duty among parties involved in a business transaction. *High Plains Genetics Research, Inc.* v. *J K Mill-Iron Ranch*, 535 N.W.2d 839, 842 (S.D. 1995).

In *High Plains Genetics Research, Inc.*, the court refused to conclude that a fiduciary duty existed between a cattle rancher and a frozen embryo transfer services company. Id. The court stated that, although the embryo services company possessed superior knowledge and technical skills, the rancher "was not in a dependent position, lacking in mental acuity, business intelligence or knowledge of the basic principles involved." Id. Thus, despite the rancher's reliance on the embryo services company's "expertise to accomplish his [business] goals . . . absent . . . the dominance-dependence imbalance found in fiduciary arrangements," the court concluded that no fiduciary duty was owed to the rancher by the embryo services company. Id., 842–43.

Similarly, the record in the present case fails to demonstrate that the defendants exercised dominance or influence over the plaintiff as a result of their superior knowledge and skill and, furthermore, fails to show that they undertook to act primarily for the benefit of the plaintiff. This failure is fatal to the plaintiff's claim. If we were to agree with the plaintiff, all parties that possess a superior, technical skill, including electricians, plumbers and mechanics, would owe a fiduciary duty to their clients. Accordingly, we conclude that the plaintiff has failed to establish that the defendants owed it the duty of a fiduciary.

### III

The plaintiff's final claim is that the trial court improperly instructed the jury that conversion and statutory theft are limited to certain types of tangible property and to the documents evidencing intangible rights.[12] The defendants, to the contrary, argue that the charge to the jury as to the claim for conversion and statutory theft was proper, and that, in any event, the plaintiff failed to produce sufficient evidence to establish that the defendants' conduct was unauthorized, as is required to support a claim for conversion and statutory theft. We conclude that the jury's findings are fatal to the plaintiff's claims for conversion and statutory theft. We therefore need not address the plaintiff's claim regarding the jury instructions.

The tort of "[c]onversion occurs when one, *without authorization,* assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights." (Emphasis added; internal quotation marks omitted.) *Wellington Systems, Inc.* v. *Redding*

---

[12] The plaintiff also claims that the trial court improperly charged the jury regarding the definition of "property." Because we conclude that the jury's findings are fatal to the plaintiff's cause of action for conversion and statutory theft, we need not address this issue.

*Group, Inc.*, 49 Conn. App. 152, 169, 714 A.2d 21, cert. denied, 247 Conn. 905, 720 A.2d 516 (1998). Similarly, "[s]tatutory theft under [General Statutes] § 52-564 is synonymous with larceny [as provided in] General Statutes § 53a-119. . . . Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or [withholds] such property from [the] owner." (Citations omitted; internal quotation marks omitted.) *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 520–21, 705 A.2d 215 (1998).

In Connecticut, intangible property interests have not traditionally been subject to the tort of conversion, except for those intangible property rights evidenced in a document. See, e.g., *Aetna Life & Casualty Co.* v. *Union Trust Co.*, 230 Conn. 779, 790 n.6, 646 A.2d 799 (1994) (conversion of trust account); *Devitt* v. *Manulik*, 176 Conn. 657, 662–63, 410 A.2d 465 (1979) (conversion applicable to account passbook). Comment (f) to § 242 of the Restatement (Second) of Torts, however, provides that "in a proper case liability for intentional interference with some . . . kind of intangible rights may . . . be found." Accordingly, the plaintiff urges this court to extend the torts of conversion and statutory theft to include intangible property rights. We need not, however, resolve this question in the context of this case, because the jury's specific responses to the interrogatories submitted to it regarding the plaintiff's claim for breach of agreement conclusively demonstrate that, irrespective of the question of whether intangible property may be the subject of the torts in question, the plaintiff did not persuade the jury that the defendants' conduct was without the authorization of the plaintiff.

In the present case, the plaintiff claimed that, in 1982, it gave Becker a license to install a repeater at its tower facility for use in Com-Tronics' business. Additionally,

the plaintiff asserted that sometime either prior to or during 1989, the parties entered into an oral agreement whereby the defendants would furnish technical assistance and service functions at the tower. The plaintiff further specifically alleged that "[i]n 1982, and thereafter until September 1992, the defendants . . . collected [and retained license and usage fees from] various people using the Tower facility" in violation of these agreements, and that "[i]n doing so, the defendants . . . [b]reached their fiduciary duty to the plaintiff . . . breached their agreement with the plaintiff . . . [and] converted property of the plaintiff, namely the right to use the Tower for transmission signals, to their own use . . . ." The defendants, to the contrary, claimed that the plaintiff was aware of and permitted them to install a community repeater at the tower in order to have paying subscribers.

The parties presented extensive conflicting evidence regarding whether the defendants had breached the agreements in question. The plaintiff presented evidence to the effect that the defendants had unlimited access to the tower, that due to the defendants' technical expertise, the plaintiff relied on them for information regarding tower customers, and that the defendants, without authorization, competed with the tower by licensing additional entities to use the tower facilities. The defendants presented evidence to the contrary effect that the plaintiff was well aware of and explicitly approved their activities because they had received permission from F. Francis D'Addario and various general managers to continue their licensing activities, and had submitted various lists to the plaintiff that indicated that the defendants' equipment was located at the tower. "When [a] conclusion is one that is dependent on the resolution of conflicting evidence, it should ordinarily be left to the jury for its judgment." *State* v. *Knight*, 56 Conn. App. 845, 853, 747 A.2d 13 (2000). A

careful examination of the record reveals that there was sufficient evidence presented to the jury for it to conclude that the defendants did not breach their agreements with the plaintiff.

The jury answered specific interrogatories and returned a verdict in favor of the defendants on the plaintiff's claims[13] for breach of agreement, conversion and statutory theft.[14] Neither party has challenged the jury interrogatories or responses in this appeal. Specifically, the jury's responses to the interrogatories regarding the plaintiff's breach of agreement claim indicate that the jury concluded that: (1) the plaintiff proved the two specific agreements that it had alleged; but that (2) the defendants did not breach either agreement.

---

[13] The plaintiff's claim for breach of fiduciary duty never reached the jury because the trial court directed a verdict in favor of the defendants on the claim.

[14] Section I, question 1 (a) of the jury interrogatories provided: "Do you find that [the plaintiff] has proven by a preponderance that in 1982 it entered into an agreement as alleged with John Becker?" The jury answered, "Yes."

Section I, question 1 (b) of the jury interrogatories provided: "Do you find that [the plaintiff] has proven by a preponderance that either during or prior to 1989, it entered into an agreement as alleged with John Becker and Com-Tronics, Inc.?" The jury answered, "Yes."

Section I, question 2 (a) of the jury interrogatories provided: "Do you find that [the plaintiff] has proven by a preponderance that John Becker breached the alleged agreement between the parties referred to in Section 1, Question 1 (a) above?" The jury answered, "No."

Section I, question 2 (b) of the jury interrogatories provided: "Do you find that [the plaintiff] has proven by a preponderance that John Becker and/or Com-Tronics breached the alleged agreement between the parties referred to in Section 1, Question 1 (b) above?" The jury answered, "No."

Section I, question 3 of the jury interrogatories provided: "Do you find that [the plaintiff] has proven by a preponderance that John Becker and/or Com-Tronics, Inc. converted property of [the plaintiff] to his and/or Com-Tronics, Inc.'s own use?" The jury answered, "No" with respect to both defendants.

Section I, question 4 of the jury interrogatories provided: "Do you find that [the plaintiff] has proven by clear and convincing evidence that John Becker and/or Com-Tronics, Inc. stole property of [the plaintiff] in violation of Connecticut General Statutes § 52-564?" The jury answered, "No" with respect to both defendants.

Necessarily implied in these findings is a finding that the defendants' licensing activities were authorized.

As previously stated, an essential element of the tort of conversion is the *unauthorized* use of another's property. *Wellington Systems, Inc.* v. *Redding Group, Inc.*, supra, 49 Conn. App. 169. Similarly, statutory theft requires that a defendant " 'wrongfully' " take, obtain or hold the property of another. *Suarez-Negrete* v. *Trotta*, supra, 47 Conn. App. 520–21. In the present case, the plaintiff relied upon the same specific evidence to support its claim of breach of agreement as it did for its claims of conversion and statutory theft. Thus, on the basis of this record, we cannot conceive of any rational theory upon which the jury could have concluded that the defendants did not breach their agreements with the plaintiff but, nevertheless, used the plaintiff's property—whether tangible or intangible—without authorization, and the plaintiff has not successfully supplied us with any such rational theory. Accordingly, we conclude that the jury's implicit finding, namely, that the defendants' use of the plaintiff's tower facility was authorized, is fatal to the plaintiff's cause of action for conversion and statutory theft.

The judgment is affirmed.

In this opinion the other justices concurred.