[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action was brought by the plaintiff, Sotavento Corporation (Sotavento), against the defendant, Morningside Partners Limited Partnership (Morningside), to recover monies due on a promissory note and revolving credit agreement executed by the parties. The court granted the plaintiff's motion for summary judgment against the defendant as to liability, but declined to grant summary judgment on the issue of damages noting questions concerning the amount allegedly owed to Sotavento.Sotavento Corp. v. Morningside Partners, L.P., Superior Court, judicial district of Fairfield at Bridgeport, Docket. No. 338583 (June 23, 1998,Skolnick, J.). This courtside inquiry is limited to the amount of money CT Page 9720 the plaintiff may recover in light of the summary judgment in its favor as to liability.
The plaintiff's only witness was Samuel L. Braunstein (Braunstein), principal of Sotavento and partner in the law firm, Braunstein Todisco, LLC. In the fall of 1995, Braunstein was approached by Charles P. LeMieux (LeMieux), general partner of Morningside, who inquired whether Braunstein could provide legal services for Morningside. (Transcript 6/22/99, p. 7, 11, 17.) LeMieux did not have access to funds for a retainer fee and the two discussed Sotavento becoming the source for providing funds for payment of legal services and other related costs. (Transcript 6/22/99, p. 11.) At the time, Sotavento was licensed to broker second mortgages. (Transcript, 5/9/00, p. 3.)
On October 26, 1995, the two parties entered into a revolving credit agreement for $150,000 (Exhibit E), which was secured by a promissory note (Exhibit F) and mortgage on Morningside's property (Exhibit D). The revolving credit agreement required that any advances be authorized by LeMieux. (Transcript 6/22/99, p. 25; Exhibit E.) From February 20, 1996, to August 30, 1996, LeMieux signed eight authorizations for advances totaling $137,250. (Transcript 6/22/99, p. 40; Exhibit G.) LeMieux also signed receipts for the advances. (Exhibit H.) Sotavento maintained a checking account in which it received checks from Morningside's property manager and disbursed checks to pay bills on behalf of Morningside. (Transcript 6/22/99, p. 76.) The checking account was not used solely for Morningside and, in some instances, payments were made by check that were only partially attributable to Morningside. (Transcript 6/22/99, p. 126.)
On July 11, 1996, LeMieux discharged Braunstein as Morningside's attorney via letter. (Exhibit 3.) After the sale of the Morningside property, Sotavento was discharged in November, 1996. (Transcript 6/22/99, p. 50.) Sotavento received $38,073.92 from the sale of the property as consideration for Sotavento's release of its mortgage. (Transcript 5/31/00, p. 93.) Sotavento applied this amount against the total amount Morningside owed. (Transcript 5/31/00, p. 94.) The final check written, for Morningside and from the Sotavento checking account was dated November 20, 1996. (Transcript 6/22/99, p. 135; Exhibit J.) Sotavento claims that it is owed $112,334.75 in addition to interest and attorney's fees. (Transcript 5/31/00, p. 94. and plaintiff's post trial memo schedule of debt.)
STANDARD OF PROOF
The defendant argues that Braunstein, who acted as an attorney for Morningside, had a fiduciary relationship with Morningside and this CT Page 9721 relationship extends to Sotavento as Morningside's lender and banker. The defendant further argues that, because Sotavento had a fiduciary duty, Sotavento must prove its case with clear and convincing evidence. "Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence. . . ." (Brackets omitted.) Murphyv. Wakelee, 247 Conn. 396, 400, 721 A.2d 1181 (1998). In the present case, the burden of proof already belongs to the plaintiff and so the burden would not shift.
The threshold issue in determining the standard of proof is, therefore, whether Sotavento owed a fiduciary duty to Morningside. "In the seminal cases in which [the Supreme Court] has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another. Hi-Ho Tower,Inc. v. Com-Tronics, Inc., 255 Conn. 20, 38, 761 A.2d 1268 (2000).
It is well established that "an attorney-client relationship imposes a fiduciary duty on the attorney." Beverly Hills Concepts, Inc. v. Schatz Schatz, Ribicoff Kotkin, 247 Conn. 48, 56, 717 A.2d 724 (1998). The defendant argues that Braunstein breached his fiduciary duty by acting as both attorney and lender to Morningside, thus violating Rule 1.8 of the Model Rules of Professional Conduct.[1] Even if this assertion were true, "[v]iolation of a Rule of the Rules of Professional Conduct should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." (Brackets omitted.) Standish v.Sotavento Corp., 58 Conn. App. 789, 796-97, 755 A.2d 910, cert. denied,254 Conn. 935, 761 A.2d 762 (2000).
Despite the close connection between Sotavento and Braunstein's affiliate organizations, this court does not believe that the fiduciary duty owed by Braunstein as attorney to Morningside, should extend to Sotavento as lender and banker. At issue in the present case is the amount of money loaned by Sotavento to Morningside under the revolving credit agreement, not Braunstein's role as attorney for Morningside. "Generally there exists no fiduciary relationship merely by virtue of a borrower lender relationship. . . ." Southbridge Associates, LLC v.Garofalo, 53 Conn. App. 11, 19, 728 A.2d 1114 (1999). This court does not find any evidence that Sotavento's relationship with Morningside, as lender and banker, was characterized "by a unique degree of trust and confidence," which is the hallmark of a fiduciary relationship. Hi-HoTower, Inc. v. Com-Tronics, Inc., supra, 255 Conn. 38. Therefore, this CT Page 9722 court will apply the ordinary standard of proof, a fair preponderance of the evidence.
ANALYSIS OF THE EVIDENCE
In support of its claim, Sotavento relies primarily on the following evidence: affidavits of Braunstein and LeMieux; the authorizations and receipts executed by LeMieux for the advances from Sotavento to Morningside; Sotavento's canceled checks, check ledger and bank statements; and, the testimony of Braunstein.
The plaintiff offered the LeMieux affidavit as evidence of the debt owed to Sotavento. The final paragraph of the affidavit states: "In conclusion, the amount due Sotavento is a legitimate debt for funds advanced to or on behalf of MPLP, at my direction and in my discretion as general partner, to defray various business expenses of MPLP." (LeMieux affidavit, paragraph 24.) The plaintiff originally prepared the LeMieux affidavit in support of its motion for summary judgment. (Transcript 1/8/01, p. 10.)
The defendant objected to the admission of the affidavit as evidence of Morningside's debt on the ground that the affidavit constitutes hearsay. In response, the plaintiff argued that the affidavit is a statement by a party-opponent, pursuant to the Connecticut Code of Evidence § 803 (1),[2] and thus was an exception to the hearsay rule. "A statement made out of court that is offered to establish the truth of the facts contained in the statement is hearsay. . . . The `admissions of a party opponent' exception requires that the hearsay evidence be offered by the party who is the opponent to the party declarant." Bell Food Services,Inc. v. Sherbacow, 217 Conn. 476, 488-89, 586 A.2d 1157 (1991).
The plaintiff argued that LeMieux, as general partner of Morningside, is ultimately liable for any outstanding debt owed by the partnership and, therefore, his statement was against his own pecuniary interest. Although the affidavit was offered by the plaintiff, the party ostensibly opposing LeMieux, the statement was also solicited and drafted by the plaintiff. This court heard extensive arguments and received briefs on the admissibility of the affidavit and is not satisfied that the statements made by LeMieux are sufficiently against LeMieux's interest to meet the requirements of the admissions of a party opponent exception to the hearsay rule. (LeMieux is responsible for partnership debt, as is the partnership, and to the extent the partnership is found liable and pays, LeMieux's liability shrinks.) Consequently, this court declines to permit the affidavit into evidence.
The plaintiff also sought to admit Exhibit N as a summary of receipts CT Page 9723 and disbursements made on Morningside's behalf. Exhibit N specifies which receipts and disbursements were subject to the Sotavento financing agreement and which were not. The plaintiff's counsel, in offering Exhibit N, said, "I can't offer it as a business record because it was printed out on a hard copy some time in October of 1997. So I can't offer it as a business record, but I can offer it as a summary which will assist the court and which is bolstered by the testimony that [Braunstein] said this document-that it existed in the computer records, and it was updated periodically as it happened." (Transcript 6/22/99, p. 144, see also Transcript 1/8/01, p. 29.) This court admitted Exhibit N into evidence "subject to not utilizing it in weighing the determinations I have to make." (Transcript 6/22/99, p. 158.)
To be used in evidence, the court requires that summaries meet the requirements of § 1005 of the Connecticut Code of Evidence.[3] The problem with which this court is faced is that Exhibit N appears to be more than a summary of other written documents in evidence because it would add information into evidence which is explained elsewhere only through Braunstein's testimony. For example, Sotavento made several disbursements that Braunstein testified were attributed in part to Morningside and in remaining part to Kings West, another partnership of which LeMieux served as general partner. Exhibit 18 documents that portion of the disbursements attributed to the Kings West credit agreement.[4] Exhibit N purports to document that portion of the disbursements attributed to the Morningside credit agreement. In this instance, Exhibit N is not a summary since it is the primary documentation showing which portion of these disbursements were attributed by Sotavento to the Morningside credit agreement. Thus, Exhibit N is not a pure summary in evidence terms.
The defendant voiced its objections to the use of Exhibit N. This court has analyzed the evidence with and without the benefit of Exhibit N determined not to utilize it in any substantive way in aid of plaintiff's case, it having probably been improvidently admitted in the first place. No use of the exhibit was to the defendant's detriment; instead this court notes that Exhibit N's value, if any it had, would solely be for what it shows regarding which transactions were not subject to the credit agreement. The documentation provided in Exhibit N would serve as evidence of the disbursements that Sotavento admits were drawn againstMorningside's own funds and not from funds advanced by Sotavento.
This court finds that the most reliable evidence in support of the debt owed by Morningside to Sotavento is contained in Exhibits G and H. Exhibits G and H are the sets of eight authorizations for advances and receipts for advances issued under the Sotavento revolving credit agreement. The defendant objected to admitting Exhibits G and H as full CT Page 9724 exhibits because Braunstein could not testify that the date on each document corresponded with the date LeMieux actually signed each document. This court admitted Exhibits G and H as full exhibits with the defendant making no concession as to the dates on documents in Exhibit G and with the dates redacted on documents in Exhibit H. (Transcript 6/22/99, pp. 48-9.)
According to Braunstein, when Sotavento received bills for Morningside's creditors, the bills were transferred to LeMieux who reviewed the bills and authorized Sotavento to advance funds to pay the bills. (Transcript 6/22/99, p. 39.) The authorizations and receipts do not specify the recipient of the funds drawn from the credit line, only the amount of the advance. (Exhibits G and H.) Four of the eight advances are in amounts that correspond to entries in the checking account register, canceled checks and checking account statements.[5]
Braunstein made these disbursements under the Sotavento line of credit at the request of LeMieux. (Transcript 5/18/00, pp. 93-96; Transcript 6/22/00, pp. 123-4, 127-30.)
The remaining four sets of authorizations and advances do not correspond precisely to entries in the checking account documentation. The first of these sets of authorizations and advances is for $4,250. Only a portion of the funds represented by the check dated March 13, 1996 and made payable to Friedman, Mellitz Newman, in the amount of $2,500, was for services attributed to Morningside, with the other half attributable to Kings West. (Transcript 5/18/00, pp. 60-1; Transcript 5/31/00, pp. 83-4; Transcript 6/22/00, pp. 125-6.) The same was true of the check dated March 13, 1996 and made payable to David T. Zahorsky, CPA, in the amount of $2,000. (Transcript 5/18/00, pp. 61-3; Transcript 5/31/00, pp. 83-4.) The full amount of check dated March 13, 1996 and made payable to Woofsey, Rosen, Kweskin Kuriansky, in the amount of $2,000, was for services on behalf of Morningside. (Transcript 6/22/00, p. 125.) Exhibit 18 indicates the disbursements attributed to Kings West. These checks are listed in the check register (Exhibit I) and bank statements (Exhibit J). The corresponding canceled checks are included in Exhibit I. Through his testimony Braunstein indicated that the portion of the three checks listed above that are attributed to Morningside totals $4,250, which corresponds with the amount on one of the sets of authorizations and receipts for advances.
On July 12, 1996, a wire transfer of $50,000 was made to the checking account from B T Investment Partners Limited Partnership. (Transcript 5/31/00, p. 26; Exhibit I.) A check was then disbursed, in the same amount and on the same date, to Braunstein Todisco, LLC. (Transcript 5/31/00, p. 27; Exhibit I.) The memo on the check, which is check number 227, indicates that the check was for "Kings West Limited Partnership." CT Page 9725 (Transcript 6/22/00, pp. 130-1; Exhibit I.) The check register has the notation "F/B/O KWLP per CLM loan docs." (Transcript 5/31/00, p. 27; Exhibit I.) Braunstein did not know who prepared the check, but said that he made the notation in the check register. (Transcript 5/31/00, p. 27.) Despite the notation in the check register, Braunstein testified that the check was a disbursement made on behalf of Morningside. (Transcript 5/31/00, pp. 26-8; Transcript 6/22/00, pp. 219-20.) A set of an authorization and receipt for advance, in the amount of $50,000, is charged to Morningside. (Exhibits G and H.)
Two additional disbursements were made on behalf of Morningside, but did not occur via the checking account. The first of these disbursements was a payment in the amount of $5,000 to Tyler, Cooper Alcorn to retain that firm to represent Braunstein in a grievance proceeding related to his involvement as attorney in the Morningside and Kings West matters. (Transcript 6/22/00, pp. 17-8.) The Kings West schedule indicates an identical payment made for the benefit of that partnership. (Transcript 6/22/00, pp. 17-8; Exhibit 18.) The disbursement to Tyler, Cooper 
Alcorn, a total of $10,000, did not come from the checking account, but was from another account; however, Braunstein could no longer recollect which one. (Transcript 6/22/00, p. 18.) An authorization and receipt for advance to Morningside, in the amount of $5,000, is contained in Exhibits G and H. The second disbursement that did not pass through the checking account was $50,000 for fees owed by Morningside to Braunstein and Todisco, LLC. (Transcript 5/31/00, p. 90-1.) The $50,000 was paid directly to the law firm's creditors. (Transcript 5/31/00, p. 90.) The disbursement occurred in September, 1996. (Transcript 5/31/00, p. 90.) An authorization and receipt for advance to Morningside, in the amount of $50,000, is contained in Exhibits G and H.
The final transaction, which the plaintiff claims as debt owed to it by Morningside, arises out of a check written on November 20, 1996, made payable to Williams, Cooney Sheehy in the amount of $15,000. (Transcript 6/22/00, p. 135; Exhibit I.) Braunstein testified that $13,158.57 of the total amount of $15,000 was pursuant to the Sotavento credit line. (Transcript 5/31/00, p. 93; Transcript 6/22/00, p. 135-6.) No authorization for advance or receipt for advance for this transaction is in evidence. (Exhibits G and H.)
This court finds that the authorizations and receipts for advances under the Sotavento line of credit, which are signed by LeMieux in his capacity as general partner, offer the best evidence of debt owed to Sotavento. In general, the authorizations and receipts are supported by additional evidence in the form of canceled checks and entries in the check register and checking account statements as well as testimony by Braunstein. CT Page 9726
Only in two instances, which include the absence of an authorization and receipt and evidence that conflicts with the authorization and receipt, does this court call into question the legitimacy of the authorizations and receipts for advances.
The last transaction that the plaintiff claims was an advance under the credit agreement was $13,158.57 of the $15,000 check to Williams, Cooney Sheehy on November 20, 1996. Although Braunstein testified that this disbursement was made for the benefit of Morningside and directed by LeMieux, there is no evidence that it was authorized by LeMieux. This disbursement is unique among the disbursements claimed by the plaintiff because it lacks a corresponding authorization for advance and receipt. In the absence of these corresponding documents, the plaintiff has failed to meet its burden of proof in establishing that this disbursement was made on behalf of Morningside and authorized by LeMieux. For this reason, the court rejects the plaintiff's claim to this amount of $13,158.57.
The second, and only other, transaction the court calls into question is the July 12, 1996 check payable to Braunstein Todisco, LLC in the amount of $50,000. Braunstein testified that the memo on the check, as well as the notation in the check register that he himself wrote, incorrectly attributed the disbursement to Kings West. This court places some significance on the notation in the check register, written by Braunstein's own hand, attributing the disbursement to Kings West. This conflicts with the corresponding authorization and receipt for advance in Exhibits G and H, which are clearly boilerplate documents that were generated by computer, and that attribute the advance to Morningside. LeMieux signed these boilerplate documents, but serious question remains as to where the mistake lies as to which entity to attribute the disbursement. The evidence is equally divided as to whether the advance and corresponding disbursement was made for Kings West or Morningside. This court finds that the plaintiff has not met its burden of proof and rejects the plaintiff's claim to this amount of $50,000.
The remaining amount that the plaintiff claims totals $49,176.08. This court finds that the plaintiff has met its burden in proving this amount as debt owed by Morningside.
The plaintiff is entitled to a judgment in the amount of $49,176.08, which represents the principal debt owed by the defendant, in addition to interest of 8% per annum, pursuant to the credit agreement. Each party is responsible for its own attorney's fees.
The Court CT Page 9727
By Nadeau, J.