[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Simian, Inc. ("Simian") is the owner of a Dunkin' Donuts franchise located in Oxford, Connecticut. The defendant Dunkin' Donuts, Inc. ("Dunkin' Donuts") is the franchisor of Dunkin' Donuts stores throughout the United States. The defendant Manual Rocha ("Rocha") owns a number of Dunkin' Donut franchises through his control of the defendant corporations M.C.R. Donuts, Inc. and Meadow St. Donuts, Inc. Simian has applied to this court for a temporary injunction restraining the operation of a competing Dunkin' Donuts shop operated by Rocha at the nearby Stop and Shop supermarket located in Seymour, Connecticut.
Simian claims that Dunkin' Donuts violated the Connecticut Unfair Trade Practices Act, (CUTPA), General Statutes § 42-110a, et seq., and the covenant of good faith and fair dealing implied in its franchise agreement by awarding a Dunkin' Donut franchise at the Stop and Shop supermarket to Rocha. Simian further asserts that it will suffer irreparable harm through a continued loss of sales by the presence of a competing store in close proximity. The defendants deny that their actions violate any statutory or contractual provisions and maintain that an injunction is not warranted.
Based on the evidence presented at the hearing on the plaintiff's application for a temporary injunction, I find the following facts. In 2001, Dunkin' Donuts embarked on a plan to open Dunkin' Donut shops in Stop and Shop supermarkets in New England ("the Stop and Shop build out"). The goal was to construct sixty such donut shops by August 31, 2002. The franchises for the shops at Stop and Shop would be awarded to existing Dunkin' Donut franchisees. Dunkin' Donuts determined that the Stop and Shop franchises would be awarded to the existing Dunkin' Donut franchisee which was closest to the designated Stop and Shop supermarket and which was "A-rated" and satisfied the "criteria to expand."
An "A-rated" franchise meant that the franchisee had received an "A" performance rating pursuant to the Dunkin' Donuts franchisee performance CT Page 2783 rating system. With respect to a network of Dunkin' Donut stores, that is multiple Dunkin' Donut shops under common ownership, the network's performance rating was determined by the lowest rating of any store in the network. For example, if a franchisee owned two Dunkin' Donut stores, with one store holding an "A-rating and one store holding a "B-rating, the network would be considered to have a "B-rating."
The "criteria to expand" was a process for identifying franchisees who were approved by Dunkin' Donuts for expansion of additional stores. To satisfy the criteria to expand, a franchisee was required to meet a number of conditions, one of which was the submission of a completed business plan.
Rocha currently owns and operates twelve Dunkin' Donuts franchises. His principal place of business is located in Naugatuck, Connecticut. The Naugatuck store is a baking operation while the remaining eleven stores are satellite locations.[1]
Dunkin' Donuts determined that Rocha owned the franchise closest to the Seymour Stop and Shop which had an A-rating and met the criteria to expand. Consequently, Rocha was invited to a meeting of qualified franchisees held on January 14, 2002 to discuss the opportunity to open donut shops at Stop and Shop stores. At that meeting, Dunkin' Donuts offered Rocha the opportunity to open franchises at four Stop and Shop locations: Seymour, Naugatuck, Wallingford and Ansonia.[2] It was an all or nothing proposal in that Rocha had to accept the franchises at all four stores. He could not pick among the stores. Rocha played no role in his selection as a franchisee offered franchise opportunities at Stop and Shop locations and he was not consulted concerning the particular opportunities he was offered.
Rocha was told that, if he was interested in these franchises, he needed to sign and return the necessary documents, along with the franchise fee of $20,500 per location, by February 20, 2002. Rocha subsequently signed and returned the appropriate documents and fees for the four Stop and Shop stores, including the Stop and Shop in Seymour.
On April 9, 2002, Rocha, through his corporation Market Donuts, Inc., entered into a Stop and Shop Satellite Agreement with Dunkin' Donuts that granted Rocha the right to operate a Dunkin' Donuts franchise at the Seymour Stop and Shop. A franchise agreement for the Seymour Stop and Shop franchise was signed by Rocha and Dunkin' Donuts on July 24, 2002. Construction of the donut shop at the Seymour Stop and Shop was completed in August 2002, at which time Rocha paid Dunkin' Donuts an additional $80,000 for the franchise. The total cost to Rocha to obtain the CT Page 2784 franchise was approximately $100,000.
Simian owns and operates a Dunkin' Donuts franchise in Oxford, Connecticut, which is approximately one mile from the Seymour Stop and Shop. At the present time, Simian is wholly owned by Anna Tessitore.
Previously, Tessitore held a 49% interest in Simian and her brother, Dominic Simone, held a 51% interest. Tessitore also shared an ownership interest in Simone's, Inc. ("Simone's") with Dominic Simone and a second brother, Frank Simone. Simone's, Inc. owned and operated a Dunkin' Donuts franchise in Seymour, Connecticut. Because of their interlocking ownership, Simian and Simone's were considered to be part of the same network and, pursuant to Dunkin' Donuts policy, the network was rated at the level of the lowest rated store in the network. Beginning September 1, 2001, the network had a B rating, even though the Oxford store was A rated, because the Seymour store had a B rating.
In the fall of 2001, Tessitore and Dominic Simone agreed to separate their business interests due to differences between them. They agreed that Tessitore would transfer her interest in Simone's to Dominic Simone in exchange for Dominic Simone transferring his interest in Simian to Tessitore. The transaction would result in Tessitore becoming the sole owner of Simian and the severing of any connection between Simian and Simone's.
On December 7, 2001, Tessitore and Dominic Simone executed stock purchase agreements in which Tessitore transferred her interest in Simone's to Dominic Simone and he transferred his interest in Simian to her. The stock purchase agreements were mailed to Dunkin' Donuts that same day.
On January 22, 2002, Tessitore met for the first time with Fred Chavez, who was the recently installed Dunkin' Donuts business consultant for the Hartford district. As a business consultant, Chavez was the representative of Dunkin' Donuts who interacted directly with franchisees. Tessitore told Chavez that she was interested in expanding and she asked him if he knew anything about the proposed Stop and Shop build out, specifically as it related to the Seymour Stop and Shop store. Even though he had attended the January 14, 2002 meeting at which Rocha was offered the opportunity to obtain the franchise at the Seymour Stop and Shop, Chavez replied that he knew nothing about it.
In April 2002, Tessitore again met with Chavez and inquired as to the status of the expansion of Dunkin' Donuts franchises into Stop and Shop supermarkets. Chavez told her that she needed to concentrate on the CT Page 2785 remodeling of her store in Oxford but that he would get her paperwork concerning the Seymour Stop and Shop.
On July 8, 2002, Tessitore learned for the first time from an employee that a Dunkin' Donut franchise at the Stop and Shop supermarket in Seymour had been awarded to Rocha. The Stop and Shop franchise opened for business at the end of August 2002. Since that time, the volume of sales at Simian's franchise in Oxford has decreased significantly. The store has experienced a reduction most acutely in the sale of donuts and bagels by the dozen and coffee by the pound.
Simian asks the court for an injunction restraining the operation by Rocha of the Dunkin' Donuts franchise at the Seymour Stop and Shop. The law governing the plaintiff's request is well known.
A party seeking injunctive relief has the burden of establishing irreparable harm and the lack of an adequate remedy at law. Walton v. NewHartford, 223 Conn. 155, 165 (1992). "Where an injury is of such a nature that it cannot be adequately compensated in damages, or cannot be measured by any pecuniary standard, it is irreparable. Whether damages are to be viewed by a court of equity as `irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered." (Quotation marks and citations omitted.) New London v. Perkins, 87 Conn. 229, 235 (1913).
The applicant for an injunction also bears the burden of establishing a reasonable degree of probability of success on the merits of the litigation. Griffin Hospital v. Commission on Hospitals, 196 Conn. 451,457 (1985).
In its consideration of a request for an injunction, the court may consider and balance the injury complained of with that which will result from interference by an injunction. Moore v. Serafin, 163 Conn. 1
(1972). The court must properly weigh the equities between the parties and only grant that relief compatible with the equities of the case.Walton v. New Hartford, supra, 223 Conn. 167.
Simian claims that Dunkin' Donuts violated CUTPA because its actions in awarding the Seymour Stop and Shop franchise were unfair and deceptive. Specifically, Simian asserts that the decision not to award it the franchise was unfair because, but for the actions of Dunkin' Donuts, it met the criteria established by Dunkin' Donuts for the award of the franchise. As of December 7, 2001, Simian was legally separated from Simone's and should have been considered to have an A-rating. It was not so considered by Dunkin' Donuts because Dunkin' Donuts had not yet CT Page 2786 processed the necessary paperwork. Simian also maintains that it met all the criteria to expand except for the submission of a business plan which it asserts was merely a ministerial act.
Simian contends that the actions of Dunkin' Donuts were deceptive because its representative, Fred Chavez, knowingly failed to inform Ann Tessitore of the plans to award the Seymour Stop and Shop franchise to Rocha despite her repeated requests for information concerning the Stop and Shop build out. Simian asserts that, if it had been appropriately informed, it would have been able to insure the timely processing of the necessary paperwork and the submission of a business plan so that it could have received the award of the franchise.
The plaintiff has established a reasonable degree of probability of success on the merits of its deceptive practices claim against Dunkin' Donuts.[3] It is well within the province of the trier of fact to find that the Dunkin' Donuts violated the provisions of the Connecticut Unfair Trade Practices Act by engaging in a deceptive practice by misleading the plaintiff as to existence of the opportunity to obtain the franchise at the Seymour Stop and Shop.
In Caldor, Inc. v. Heslin, 215 Conn. 590 (1990), the Connecticut Supreme Court established that three requirements must be met in order to find that an act or practice is deceptive under CUTPA: first, there must be a representation, omission, or other practice likely to mislead consumers; second, the consumers must interpret the message reasonably under the circumstances; third, the misleading representation, omission, or practice must be material — that is, likely to affect consumer decisions or conduct. Caldor, Inc. v. Heslin, supra, 215 Conn. 597.
Anna Tessitore informed Dunkin' Donuts through her conversations with Fred Chavez of her interest in the opportunity to obtain the franchise at the Seymour Stop and Shop. Chavez affirmatively misled her, first by stating that he knew nothing about it and, subsequently, by stating that he would give her paperwork on it when he never intended to do so.
Dunkin' Donuts claims that any deception is immaterial since it came after Rocha had already been offered the Seymour Stop and Shop franchise and Simian was otherwise ineligible to receive the opportunity because it was not A-rated and had not submitted a business plan. Dunkin' Donuts however reserved the right to rescind offers of Stop and Shop franchises until a franchise agreement was signed, which in this case was July 24, 2002, and Dunkin' Donuts did in fact rescind offers after they were made. Moreover, a trier of fact could find that the impediments to Simian receiving the Seymour Stop and Shop franchise were due to inexcusable CT Page 2787 inactions by Dunkin' Donuts. Simian remained B-rated despite the termination of its interlocking ownership with Simone's because Dunkin' Donuts had not processed the necessary paperwork. Simian had not filed a business plan, a relatively quick and easy endeavor, because Dunkin' Donuts did not inform Simian that its failure to do so prevented it from being considered for the Seymour Stop and Shop franchise.
This court need not find that the actions of Dunkin' Donuts were so deceptive as to violate CUTPA and I therefore do not reach that issue. It is sufficient that I do find that the plaintiff has established a reasonable degree of probability that the conduct of Dunkin' Donuts was violative of the act. The same cannot be said however with respect to the plaintiff's claims against the defendant Rocha.
Simian asserts that Rocha violated CUTPA by breaching his fiduciary duty to Simian. Simian contends that Rocha, as the elected representative of the Hartford District franchisees to the Dunkin' Donuts Regional Advisory Council, had the duty to deal fairly with Simian which he breached by failing to inform Simian of the opportunity to obtain the Seymour Stop and Shop franchise when it was offered to him. The facts established at the hearing on the plaintiff's request for a temporary injunction do not support this claim.
Rocha serves as an elected representative and vice chairman of Hartford District of Dunkin' Donuts franchisees, a district of which Simian was a member. As vice chairman, Rocha was entitled to attend the Regional Advisory Council. The Regional Advisory Council serves as a vehicle through which representatives of franchisees are able to discuss with senior management officials of Dunkin' Donuts various issues of concern to franchisees, such as territories, standards, competition and marketing initiatives.
"It is well settled that a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) Hi-Ho Tower, Inc. v. Com-Tronics, Inc.,255 Conn. 20, 38 (2000). Fiduciary relationships have been found to exist where the fiduciary was in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another. Id.
No evidence was presented in this case that Rocha held a fiduciary relationship with Simian with respect to the Stop and Shop build out. Rocha did not acquire any information with respect to the Stop and Shop CT Page 2788 build out or the potential franchise at the Seymour Stop and Shop at any Regional Advisory Council meeting. The first he heard of the Seymour Stop and Shop franchise opportunity was at the meeting of qualified franchisees held on January 14, 2002. Nor was Rocha offered the Seymour Stop and Shop franchise because of his positions as vice chairman or Regional Advisory Council member. Rocha was offered the franchise by Dunkin' Donuts because he satisfied the criteria applied to every other franchisee: he was the closest franchisee who possessed an A-rating and who met the criteria to expand. Rocha was not in a dominant position or under any specific duty to act for the benefit of Simian with respect to the opportunity to open a franchise at the Seymour Stop and Shop.
To establish its right to an injunction, the plaintiff has the burden of proving irreparable harm and the lack of an adequate remedy at law.Walton v. New Hartford, 223 Conn. 155, 165 (1992). The harm to Simian in this case is the loss of past and future sales at its Oxford store as a result of the opening of a Dunkin' Donuts franchise at the Seymour Stop and Shop as well as the loss of the profits that Simian would have received had it been awarded the Seymour Stop and Shop franchise. Simian argues that damages will not adequately compensate it for its losses because it will be difficult to calculate both the loss of sales at its Oxford store that is attributable to the opening of the Seymour franchise and the profit that it would have realized had it operated the Seymour franchise. Simian also maintains that damages are inadequate because its losses will continue indefinitely in the future.
I am not persuaded that the plaintiff's past damages will be exceptionally difficult to calculate in this case. At the time of the final hearing in this matter, the plaintiff should be able to show the extent to which the sales at its Oxford store have been reduced. Simian should also be able to show, after discovery, the amount of any profit that Rocha has garnered from the operation of the franchise at the Seymour Stop and Shop and, if appropriate, the efforts that Simian would have made to further increase those profits.
Future lost sales and profit that will continue to occur after the time of the final hearing are more difficult to measure. Whether that difficulty warrants the issuance of an injunction is best left for consideration at the time of trial. The principal purpose of a temporary injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits. Olcott v.Pendleton, 128 Conn. 292, 295 (1941). Any harm that will come to the plaintiff until a hearing on the merits can be adequately compensated by an award of damages. CT Page 2789
This court is also obligated to weigh the equities of the case when determining whether to issue a temporary injunction. Walton v. NewHartford, supra, 223 Conn. 167. "Those equities should take into account the gravity and wilfulness of the violation, as well as the potential harm to the defendants." Johnson v. Murzyn, 1 Conn. App. 176, 183
(1984). "In exercising its discretion, the court in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." Tomasso Bros., Inc. v. October TwentyFour, Inc., 230 Conn. 641, 648 (1994).
The issuance of an injunction would cause considerable harm to Rocha, a party who bears no culpability for any injury to the plaintiff. Simian asks for an injunction restraining Rocha from operating the Dunkin' Donuts shop at the Seymour Stop and Shop. Rocha has invested over $100,000 in obtaining the franchise and opening the store. The store has weekly sales of approximately $6,500. All this would be lost to Rocha for the duration of the temporary injunction.[4] He would be forced to close down an ongoing business when it has not been established that he has done anything wrong. Equity does not counsel inflicting harm on an innocent party.
In light of the foregoing, the plaintiff's request for a temporary injunction is hereby denied.
 BY THE COURT Jon M. Alander